[Civ. No. 19708.   Second Dist., Div. One.   Nov. 23, 1953.]

COUNTY OF LOS ANGELES, Petitioner, v. JOHN ANSON FORD, as Chairman of Board of Supervisors, etc., Respondent; COLLEGE OF MEDICAL EVANGELISTS (a Corporation), Real Party in Interest and Intervener.

[Civ. No. 19709.   Second Dist., Div. One.   Nov. 23, 1953.]

COUNTY OF LOS ANGELES, Petitioner, v. JOHN ANSON FORD, Respondent; UNIVERSITY OF SOUTHERN CALIFORNIA, Real Party in Interest and Intervener.

Harold W. Kennedy, County Counsel, and Gerald G. Kelly, Assistant County Counsel, for Petitioner.

S. V. O. Prichard for Respondent.

Musick & Burrell, Anson B. Jackson, Jr. and James E. Ludlam for Real Party in Interest and Intervener in Civ. No. 19708.

Asa V. Call and Wright, Peeler & Garrett for Real Party in Interest and Intervener in Civ. No. 19709.

DRAPEAU, J.—By the instant proceedings in mandamus, the county of Los Angeles seeks to compel respondent Ford, as chairman of the board of supervisors, to execute contracts pursuant to which the medical schools of the College of Medical Evangelists and the University of Southern California would render medical and teaching services in the county hospital.

The board of supervisors approved each of the contracts in formal session and directed its chairman to sign them. His refusal to do so is based upon the premise that the contracts are invalid, because: (1) they violate the civil service provisions of the county charter; and (2) they constitute an unlawful corporate practice of medicine by medical schools.

Among other things, the petition alleges that the petitioner has a mandatory duty to provide medical care for the indigent sick. (Welf. & Inst. Code, § 2500.)

That, in order to do this, petitioner maintains the county hospital which consists of a group of hospitals. Two of them are general hospitals, to wit: Los Angeles County General Hospital and Los Angeles Harbor General Hospital. These are operated as teaching institutions.

The purpose of this is to adequately staff the two general hospital facilities, and thereby attract internes and student trainees to serve in these institutions, and also to maintain a standard of medical care and treatment at an adequate level.

This is made possible by affiliations with universities and colleges having accredited medical schools, which provide medical specialists from their teaching staffs. These specialists provide effective on-the-job training and teaching facilities to those employees holding permanent civil service classification, i.e., "residents, internes, graduate nurses, student nurses, laboratory technicians, x-ray technicians, dietitians, medical

social workers, physiotherapists and occupational therapists,'' thus enabling the hospital to keep abreast of modern medical techniques.

The medical teaching staffs of these private schools have also rendered medical care and services to indigents in the county hospital. This plan of affiliation between large public hospitals and private schools of medicine is in common practice throughout the United States.

These services have been rendered gratuitously by the teaching staffs of University of Southern California, the College of Medical Evangelists and the College of Osteopathic Physicians and Surgeons. Recently, the presidents of these three institutions gave notice to the board of supervisors of Los Angeles County that they could no longer continue to do so. And that they would be forced to restrict or terminate these services unless petitioner would agree to pay a fair compensation therefor.

It is further alleged that said board has determined that it is necessary to continue operating the Los Angeles County General Hospital as a teaching hospital in order to adequately care for the indigent sick. As a result, it instructed the chief administrative officer of the county to negotiate contracts with the three named medical schools in order to assure the continuation of these services. A separate contract was negotiated with each medical school.

The proceedings here have reference to the contracts between the County of Los Angeles and the University of Southern California and the College of Medical Evangelists. As to these, the board of supervisors of said county, in formal session on March 24, 1953, gave its approval and directed the chairman of the board to sign them.

The preambles of such contracts set forth that the county operates, through its department of charities and under the administrative direction of its superintendent of charities, the Los Angeles County General Hospital; that the county desires to assure the continued operation of said hospital as a teaching hospital so that proper and adequate hospital care may be granted to county indigents and other patients lawfully admissible thereto; and that it can only maintain its hospital as a teaching hospital so long as it remains associated with qualified medical schools.

The parties hereto have stipulated respecting the time to be spent and the procedures to be followed by faculty members of the two medical schools (1) in teaching medical students;

and (2) in rendering hospital services, i.e., care of patients and training of hospital employees.

In addition, the contracts between the respective parties provide that both the college and the university through their medical schools shall conduct at the hospital such medical research projects as shall be authorized and approved in advance by the superintendent, and shall furnish clinical and scientific equipment of a certain aggregate minimum during the term of the contracts, the date of termination thereof being set as of June 30, 1957.

County agrees to pay a sum certain each month to the college and the university. And it is mutually agreed that by the terms of the contracts, (1) county has not granted or delegated any of its powers—statutory, implied, administrative, medical or otherwise; and (2) that the college, the university, the medical schools, doctors and medical students are independent contractors, and shall be responsible for the manner in which they perform the services required after they have been advised by the superintendent what activities they shall perform.

Respondent argues that article IX of the charter establishes in the county a system of civil service which is completely comprehensive and that it applies to *every* position "now existing or hereafter created" (§ 33) with certain specifically enumerated exceptions. And requires that *all* persons, except those in unclassified service, shall be employed through the instrumentality of civil service.

In support of his premise that the instant contracts violate article IX of the charter, respondent cites *Stockburger* v. *Riley,* 21 Cal.App.2d 165 [68 P.2d 741], and *State Compensation Insurance Fund* v. *Riley,* 9 Cal.2d 126 [69 P.2d 985, 111 A.L.R. 1503]. Both of these cases hold that under the allegations therein made, the services involved were available under the state civil service system, and might not be obtained outside thereof.

However, they both concede in the following language that there are situations in which services may be obtained outside of civil service:

". . . there still is recognized a field wherein the state may engage the service of one under special contract or agreement outside of civil service, as an independent contractor." *Stockburger* v. *Riley, supra* (21 Cal.App.2d 165, 167).

". . . There undoubtedly is a field in which state agencies may enter into contracts with independent contractors. But

the true test is not whether the person is an 'independent contractor' or an 'employee', but whether the services contracted for, whether temporary or permanent, are of such a nature that they could be performed by one selected under the provisions of civil service . . .'' *State Compensation Insurance Fund* v. *Riley, supra* (9 Cal.2d 126, 135.)

However, in two later cases, i.e., *San Francisco* v. *Boyd,* 17 Cal.2d 606 [110 P.2d 1036], and *Kennedy* v. *Ross*, 28 Cal. 2d 569 [170 P.2d 904], both of which involved civil service provisions of the San Francisco charter similar to those here under consideration, the Supreme Court upheld contracts against attacks of the sort here made by respondent.

By the terms of the contract in the Boyd case between the city and county of San Francisco and one Purcell, a civil engineer, the latter was to furnish certain employees and his own services for a period of five years and for the consideration of $100,000 ''to aid in the solution of traffic and transit problems.'' It was there argued that the contract violated civil service provisions of the charter.

In the decision in that case, it is stated, 17 Cal.2d 606, 619 [110 P.2d 1036], as follows:

''A reading of the entire text of said several sections indicates clearly that it was the intention of the framers of the charter that civil service should apply only to persons *employed in permanent positions* in municipal departments to the end that public service should be free from political shifting and control resulting from changes in administration. If section 142 were to be given the literal application suggested by respondent, it would be impossible for the municipality to make an independent contract with any person or corporation to render an extraordinary service or to make surveys with a view of legislation on behalf of the municipality.

''The proposed contractor is not to be placed in any position provided for by the charter. He is to be engaged under a contract to do a specific job and all of the assistants which he will employ from the typist in his office to his most highly paid engineer are to be instrumentalities of his own choosing and for whom he is to be responsible. They do not become city employees in the sense of that word, as used in reference to the classified service, but are to be employees of the engineer whose contract requires that he supply the city with estimates, plans, programs and reports, such as will enable the municipality to advance the public welfare by the improve-

ment of conditions with respect to which his services will be rendered.

". . . Merely because Purcell's appointees will render services for the city does not place such appointees in a 'position' or a 'department' or in an 'office.' 'Employees' under civil service occupy the relationship of servant to master and are, of course, subject to the control of the municipality but the position of the employees of the contractor will in no respect occupy a 'position' in a 'department' of the city as contemplated by the charter's civil service provisions. . . . the contractor is employed as an independent contractor. . . ."

In *Kennedy* v. *Ross, supra* (28 Cal.2d 569, 572), the Supreme Court reached a similar conclusion, stating:

"The provisions of the charter do not foreclose the authorized agency from entering into contracts with individuals for the performance of professional services as independent contractors." See, also, *City of Oakland* v. *Williams,* 15 Cal. 2d 542 [103 P.2d 168] and *Burum* v. *State Compensation Insurance Fund,* 30 Cal.2d 575 [184 P.2d 505].

Likewise here, the faculty members of the medical schools, who are to render the teaching and medical services required by the contracts, are not employees in the usual or ordinary sense. As hereinabove mentioned, the contracts provide that the university and the college medical faculties, the doctors and the students are independent contractors, and shall be responsible for the manner in which they perform the required services "after they have been advised by the Superintendent what activities they shall perform."

By the terms of the instant agreements, the college and the university agree that in addition to teaching, and concurrently therewith, their faculty members will render medical care and service as designated by the superintendent of the hospital. "The medical care and services will include direct care of patients and supervision of the medical care rendered by resident physicians and internes of the Hospital . . . Medical treatment will be rendered by the doctors on the teaching staff of the schools to both in-patients and out-patients at the Hospital under the direction of the Superintendent."

Respondent claims that such medical care and services rendered to the patients by the faculty members of the respective medical schools constitutes unlawful corporate practice of medicine by said medical schools.

Without question the schools involved are qualified and

accredited medical schools, and the faculty members thereof are regularly licensed physicians and surgeons.

■ Basically, the rule against corporate practice of medicine is designed to protect the public from possible abuses stemming from commercial exploitation of the practice of medicine.

In *People* v. *Pacific Health Corp.,* 12 Cal.2d 156, 160 [82 P.2d 429, 119 A.L.R. 1284], the court makes a fundamental distinction between the health corporation there in question and "philanthropic associations" such as "fraternal, religious, hospital, labor and similar benevolent organizations furnishing medical services to members" in the following language:

"In nearly all of them, the medical service is rendered to a limited and particular group as a result of cooperative association through membership in the fraternal or other association, or as a result of employment by some corporation which has an interest in the health of its employees. The public is not solicited to purchase the medical services of a panel of doctors; and the doctors are not employed or used to make profits for the stockholders. In almost every case the institution is organized as a nonprofit corporation or association. Such activities are not comparable to those of private corporations operated for profit and, since the principal evils attendant upon corporate practice of medicine spring from the conflict between the professional standards and obligations of the doctors and the profit motive of the corporation employer, it may well be concluded that the objections of policy do not apply to nonprofit institutions. This view seems almost implicit in the decisions of the courts and it certainly has been the assumption of the public authorities, which have, as far as we are advised, never molested these organizations."

And in *California Physicians' Service* v. *Garrison,* 28 Cal. 2d 790, 810 [172 P.2d 4, 167 A.L.R. 306], it was stated:

"One of the reasons behind the declaration of the earlier cases that it was against public policy for a corporation to engage in the practice of medicine was because the control of its activities was placed in the hands of laymen."

As heretofore stated, petitioner must care for the indigent sick.

Section 202 of Welfare and Institutions Code prohibits the board of supervisors from contracting for the care of such persons except in certain circumstances which include cases:

"(2) which require treatment or the use of facilities not immediately available in the county hospital."

In such event, the cited section permits the board to secure "hospital service or any portion thereof from any public or private hospital, clinic, rest home, sanitarium or other *suitable facility* or from any corporation formed under section 9201 of the Corporations Code or under Chapter 11A of Part 2, Division 2, of the Insurance Code, and operating in the State.

"(b) As used in this section 'hospital service' includes medical, surgical, radiological, laboratory and nursing service and such other care, service or supplies as may be necessary for the treatment of the sick or injured. . . .

"(d) The county may also contract for medical treatment of persons admissible to the county hospital with any duly licensed physician and surgeon." (Emphasis added.)

It would appear that the language of the quoted section furnishes sufficient authority for entering into the contracts here in question. The real purpose of the contracts is to furnish to the county hospital those necessary services and facilities without which it could not function as a teaching institution. These facilities include medical treatment of indigent patients in the county hospital by individual members of the medical profession. Such service is actually furnished by medical practitioners who happen to be members of the teaching staff of the two medical schools, and in no sense by the medical schools of the college and the university.

The contracts here in question do not call upon the college, the university or their respective medical schools to practice medicine. The actual diagnosis and treatment of patients will be done by licensed physicians, to wit: faculty members. Perhaps that fact alone would not be conclusive, if the schools were soliciting the public or offering medical services to the public generally. In the instant cause, the schools have no legal or factual contact with the public or with the hospital patients. As a result, they play no part in the relationship of doctor and patient.

In the circumstances, accredited nonprofit educational institutions like university and college may enter into the contracts for care of the indigent sick without in any way violating the principles upon which the rule against corporate medical practice rests.

Let the peremptory writs issue as prayed for.

White, P. J., and Doran, J., concurred.