[No. A086367. First Dist., Div. Four. Nov. 13, 2000.]

WILLIAM STEINSMITH, Plaintiff and Respondent, v.
MEDICAL BOARD OF CALIFORNIA, Defendant and Appellant.

**COUNSEL**

Bill Lockyer, Attorney General, Alvin Korobkin, Assistant Attorney General, Vivien Hara Hersh and Jose R. Guerrero, Deputy Attorneys General, for Defendant and Appellant.

Pillsbury Madison & Sutro, Thomas V. Loran III and Kristine L. Ching for Plaintiff and Respondent.

## OPINION

**HANLON, P. J.**—The Medical Board of California (Board) appeals from a judgment granting a peremptory writ of mandate commanding it to set aside a citation it issued to Dr. William Steinsmith. We reverse.

### I.

Steinsmith is a Board-licensed physician who performed disability evaluations of persons referred by the California Department of Social Services at the Bay View Medical Clinic (Clinic) in San Francisco beginning in 1993. Steinsmith was an independent contractor of the Clinic and the sole physician working there. He was cited by the Board in October 1997 for aiding the unlicensed practice of medicine in violation of Business and Professions Code section 2264.[1] The basis for the citation was that he worked at the Clinic when he knew that it was partially owned by two individuals, Constancio Yu and Mary Downes, who did administrative work for the Clinic and were not licensed physicians.

The prohibition against practicing medicine without a license extends to any person "who advertises or holds himself or herself out as practicing" medicine, which is defined broadly to include among other things the diagnosis of ailments, diseases, injuries, or the "physical or mental condition of any person." (§ 2052.) Medicine may be practiced in a partnership or group of physicians (§ 2416), but "[c]orporations and other artificial legal entities . . . have no professional rights, privileges, or powers" (§ 2400), and a "fictitious-name" permit to operate a facility called a " 'medical clinic' " can be issued only if the clinic is wholly owned by licensed physicians (§ 2415, subd. (b)).

Steinsmith was fined $500 and ordered to "cease and desist from further violations of this nature." He appealed the citation and requested an administrative hearing.

At the hearing, Board investigator Charles McCort and consultant Dr. Martha Snider testified that Steinsmith told them at a September 1995

---

[1]All further statutory references are to the Business and Professions Code. Section 2264 provides that "the aiding, or the abetting of any unlicensed person . . . to engage in the practice of medicine . . . constitutes unprofessional conduct."

conference on another matter that the Clinic was owned by Dr. Yu, "a Filipino/Chinese physician" who was not licensed in this state. McCort said he told Steinsmith that he believed Steinsmith's employment by unlicensed individuals was unlawful. McCort had a second meeting with Steinsmith in December 1996. At that time Steinsmith said that the Clinic was owned by Yu and Downes, who were unlicensed.

McCort discovered that Dr. Adelo Aquino, a California-licensed physician who lived out of state, was listed as the Clinic's owner on its fictitious name permit. Yu informed McCort that the business was owned 63 percent by Aquino, 25 percent by Yu, and 12 percent by Downes. In June and July 1997, Yu and Aquino wrote McCort and stated that they were unaware before he contacted them that this ownership arrangement was unlawful, but had confirmed the illegality with counsel and were closing the Clinic. Their counsel advised McCort that the Clinic had been sold. Steinsmith testified that the Clinic was sold in July 1997 to Dr. Nazshakir, a licensed physician.

Steinsmith said that he had worked with complete "clinical autonomy" at the Clinic since 1993, and that "of the thousands of patients I examined and reported on, not in a single instance did I commit an irregularity or a bad faith act." He said that he was unaware before September 1995 of the requirement that medical practices be solely owned by California-licensed physicians, and was "shocked to receive that interpretation" at the conference with McCort and Snider. He said that, until September 1995, the fictitious name permit on the Clinic wall had given him "a certain assurance . . . that I was in the affection and embrace of the state government."

Steinsmith testified that he continued working at the Clinic after September 1995 because he questioned McCort and Snider's legal opinion and the public policy behind the law. He "felt that this interpretation on their part was not an accurate one and was poor public policy, and that they were not attorneys, I wasn't an attorney, and that I would—I decided I would weather this out and risk a prosecution because I thought the continuation of my work there had a certain importance, and that, of course, has brought me to the present proceedings." He added: "I was convinced I was doing a good and important work. I was attempting to go draw a circle around the applicants who were really disabled and to ensure that they did get their benefits and so on. I didn't want that disrupted because of formalities or because I was cowering to a formal legal opinion which I didn't believe in, in the first place."

Steinsmith's "public policy" objections to the Board's position were illuminated in questions to McCort concerning correspondence McCort received from Steinsmith during his investigation. McCort testified that three

or four months before the investigation was concluded, Steinsmith sent him a Board "Action Report" indicating that it was illegal for licensed physicians to work for unlicensed people who owned medical clinics. On cross-examination, Steinsmith asked McCort if he had received "a mailing from me where I editorialize on a statement in the action report of the Medical Board, which was published on October 1996." Steinsmith handed McCort two documents, a Board Action Report of October 1996 explaining the Board's position that medical work for unlicensed individuals was illegal, along with a typewritten note on Steinsmith's letterhead, and asked McCort to confirm that he had received them.

The Action Report cited sections 2052 and 2400 previously quoted, and explained that "the ban on corporate practice is intended to prevent interference with the physician-patient relationship by a corporation or other unlicensed person and to ensure that medical decisions are made by a licensed physician. [¶] . . . [T]he physician should not be forced to choose between the dictates of his or her 'employer' and the best interests of the physician's patients. [¶] It is this potential for divided loyalties . . . that the bar against corporate practice is intended to prevent."

The Action Report continued: "In the last several years, the board has initiated disciplinary action against physicians who allowed their licenses to be 'used' by lay individuals or corporations. A physician can be disciplined for aiding and abetting unlicensed persons to practice medicine (. . . Section 2264). This constitutes unprofessional conduct, which may result in the ultimate sanction: license revocation. In one particular case which resulted in discipline against a physician's license, the lay corporation (which was ostensibly a management company) owned and operated clinics. The physician contracted with the management company and obtained the fictitious name permits for the clinics. The physician saw patients and performed surgery at one of the clinics about once a week. The medical records were the property of the management company and not the physician. The management company paid the physician a set percentage of the patient fees. In other words, the management company was really practicing medicine without a license and the physician had aided and abetted that unlicensed practice of medicine."

Steinsmith's typewritten note read as follows: "Once upon a time there existed a capitalist republic in which the brigands of high finance had corrupted and enslaved the physicians in a plot to coin superprofit from the healthcaresystem. [¶] Following a decade of wholesale engulfment by this conspiracy of the province of California, its cockamamie medical board was heard to snivel anent the transgressions of a handful of marginal petty-hustlers . . . [sic] with nary a peep about the multibillion HMOs which were devouring the ethical profession . . . ."

McCort could not specifically remember these two documents but did not deny receiving them. He said he received numerous documents from Steinsmith during his investigation.

McCort acknowledged seeing a valid fictitious name permit on the wall of the Clinic in December 1996. The administrative law judge (ALJ) asked the Board's counsel about the significance of the fictitious name permits that had been issued to the Clinic. Counsel indicated that when a physician like Dr. Aquino states under penalty of perjury in the application for the permit that he is sole owner of the practice, the Board generally accepts the representation and does no further inquiry apart from verifying the physician's license. In this case, the ownership interests of the unlicensed individuals did not come to light until Steinsmith disclosed them. Counsel advised that Aquino had been cited and fined for the violation.

In closing arguments at the hearing the Board's counsel acknowledged that Steinsmith's violation was "de minimis in nature," but submitted that his relatively modest fine was warranted under the circumstances. Steinsmith pointed out that he had received no formal written notice of any impropriety from the Board in 1995, and stated that he would have "challenged the interpretation" in any event. He concluded: "I regarded the Medical Board's perspective, again, as contrary to public policy, and this is the reason I persisted in my practice in good conscience and in good faith."

The citation was upheld by the ALJ. The ALJ concluded, citing sections 2052 and 2400, that Yu and Downes as part owners of the Clinic were engaged in the unlicensed practice of medicine. At one point in the hearing the ALJ told Steinsmith: "This is a simple case, Doctor. Did you or did you not practice in a clinic owned by unlicensed people, and did you know it or not?" The ALJ found against Steinsmith on both of those points. His proposed decision, which was adopted by the Board, read in pertinent part:

"While it is true that respondent began his employment at the clinic in complete good faith, he was advised in September 1995 that his employment there was in violation of the law. Respondent nevertheless continued to work there. He was again advised in December 1996 that his employment at the clinic was in violation of the law. Once more, he continued to work there despite this advice. In doing so, respondent stood by his principles—his belief that the Board's legal interpretation was wrong and his commitment to serving a desperately needy population—and chose to risk prosecution.

"It is recognized that respondent did not 'prostitute the profession' by allowing the unlicensed owners of the clinic to influence his medical independence or judgment in any way. But he nevertheless knowingly violated

the law for nearly two years (from September 1995 until July 1997) by remaining in what was a technically illegal practice situation. Considering this latter fact, and notwithstanding respondent's initial good faith and subsequent commitment to principle, it is determined that the order of abatement and monetary fine imposed in the citation are appropriate."

Steinsmith challenged the decision by his petition for writ of mandate herein. At the hearing on the petition, the court focused on whether the Clinic itself was "licensed." The court asked the Board's counsel, "Shouldn't you have done something regarding the clinic other than issuing a citation to Dr. Steinsmith?" Counsel explained that the Board took action "similarly to Dr. Steinsmith" against Aquino, Yu, and Downes. The court wondered, "if you have a licensed clinic, how are you aiding the unlicensed practice of medicine?"

The statement of decision, with administrative record citations omitted, explained the court's decision as follows: "[T]he Board's case was that the Clinic's work was illegal because not all of its owners were licensed, and that Dr. Steinsmith assisted the work of the Clinic. The Board did not present any evidence that Yu and Downs were practicing medicine in their individual capacities. [¶] The evidence presented by the Board does not support the Board's conclusion that Dr. Steinsmith violated Section 2264 by aiding the unlicensed practice of medicine. The Board presented uncontradicted evidence that it issued a license to the Clinic and that the Clinic was operating under that license. Further, as the Board's counsel confirmed to this Court, the Board failed to introduce any evidence that the Clinic was ever unlicensed. [¶] Because there was no evidence that the Clinic was unlicensed during the time period that Dr. Steinsmith worked at the Clinic, the Board's conclusion that Dr. Steinsmith aided the unlicensed practice of medicine is not supported by any evidence and cannot stand."

## II.

Preliminarily, we note that this case does not involve revocation, suspension, or restriction of Steinsmith's license, and thus that the provision for review of superior court decisions in such matters solely by writ petition does not apply here. (§ 2337; see *Leone v. Medical Board* (2000) 22 Cal.4th 660, 663-664 [94 Cal.Rptr.2d 61, 995 P.2d 191].) ■ Since this case involves only a fine and not any licensing sanction, we conclude that this is not an instance where the trial court was authorized to exercise its independent judgment on the evidence. (Compare *Mann v. Department of Motor Vehicles* (1999) 76 Cal.App.4th 312, 320-321 [90 Cal.Rptr.2d 277] [revocation of professional license; independent judgment test applied] with *Steve P.*

*Rados, Inc. v. California Occupational Saf. & Health Appeals Bd.* (1979) 89 Cal.App.3d 590, 592, 594-595 [152 Cal.Rptr. 510] [imposition of fine; substantial evidence test applied].) Thus, as to issues of fact, the only question for us, as it was for the trial court, is whether the Board's findings were supported by substantial evidence in the administrative record. (*Steve P. Rados, Inc.*, at p. 595.) As to issues of law, we must give great weight to the Board's interpretation but ultimately exercise our independent judgment. (*Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].)

█ The administrative record contains substantial evidence that Steinsmith provided medical services at a clinic he knew to be owned by individuals who were not licensed to practice medicine. This evidence was sufficient to sustain the citation, and the trial court erred in concluding otherwise.

The trial court apparently reasoned that there was no unlicensed practice of medicine in this case because the Clinic itself was always "licensed." However, the principals in question, Yu and Downes, had two "licensing" requirements to fulfill in order to make their activities lawful: (1) they had to obtain a fictitious name permit to operate a medical clinic (the Clinic's "license") (§ 2415, subd. (a)); and (2) they had to themselves be licensed to practice medicine (§ 2415, subd. (b)(1)). The trial court overlooked this second requirement in assessing Steinsmith's culpability as an aider of Yu and Downes.

Steinsmith contends that Yu and Downes did not practice medicine because they merely owned the Clinic and administered its business affairs. A similar argument was rejected long ago in *Painless Parker v. Board of Dental Exam.* (1932) 216 Cal. 285 [14 P.2d 67]. In that case, a licensed dentist was found to have aided and abetted the unlicensed practice of dentistry by a corporation he formed to own and operate dental offices. (*Id.* at pp. 289, 298.) The dentist argued, as Steinsmith does here, that the licensing requirements for the provision of professional services did not apply to "the purely business side of the practice." (*Id.* at p. 295.) Our Supreme Court rejected that argument, holding: "The law does not assume to divide the practice of dentistry into such departments. Either one may extend into the domain of the other in respects that would make such a division impractical if not impossible. The subject is treated as a whole. If the contention of [the dentist] be sound, then the proprietor of the business may be guilty of gross misconduct in its management and violate all standards which a licensed dentist would be required to respect and stand immune from any regulatory supervision whatsoever. His employee, the licensed dentist, would also be

immune from discipline upon the ground that he was but a mere employee and was not responsible for his employer's misconduct, whether the employer be a corporation or a natural person." (*Id.* at p. 296.) The opinion also referred to the basic rationale of the corporate practice prohibition: the potential for "a secondary and divided loyalty to the patient." (*Id.* at p. 297.)

Although the *Painless Parker* case involved dentistry rather than medicine, its reasoning and holding apply equally to medical practice. (See, e.g., *People v. Pacific Health Corp.* (1938) 12 Cal.2d 156, 158 [82 P.2d 429, 119 A.L.R. 1284] [citing *Painless Parker*]; *Marik v. Superior Court* (1987) 191 Cal.App.3d 1136, 1140 [236 Cal.Rptr. 751] [same].) The unlicensed practitioner in *Painless Parker* was a corporation, but it has long been "well settled" that "any other unlicensed person or entity" is subject to the same sanctions for unlawful practice as an unlicensed corporation. (*Pacific Employers Ins. Co. v. Carpenter* (1935) 10 Cal.App.2d 592, 594-595 [52 P.2d 992].) Accordingly, the *Painless Parker* case disposes of Steinsmith's argument that there was no unlicensed practice he could have aided.

There are to be sure some "chinks in the armor of the corporate practice doctrine. Certain medical and other institutions are allowed to enter into certain contracts for employment of physicians, but only under certain circumstances." (*Conrad v. Medical Bd. of California* (1996) 48 Cal.App.4th 1038, 1044 [55 Cal.Rptr.2d 901]; see, e.g., § 2411 [HMO exception].) Steinsmith submits that his contract with the Clinic was akin to the one authorized in *County of Los Angeles v. Ford* (1953) 121 Cal.App.2d 407 [263 P.2d 638], where a county was authorized to contract with medical schools to provide staffing for county general hospitals. However, the *Ford* case is distinguishable. The contracts in *Ford* enabled the county to fulfill its obligation to care for the indigent sick (*id.* at pp. 408-409), and the Clinic owners here had no similar obligation. Steinsmith identifies no exception to the corporate practice rule which would be applicable in this case.

Steinsmith claims that he cannot be found to have aided Yu and Downes's unlawful activity because he did nothing to secure the Clinic's fictitious name permit. However, Yu and Downes needed more to operate their medical business than the fictitious name permit Aquino obtained for them. They also needed someone to do the medical work. As the sole physician practicing at the Clinic, Steinsmith aided Yu and Downes as much as Aquino did. We note in this regard that the fictitious name requirement and the corporate practice rule serve distinct public purposes. (Compare *Painless Parker v. Board of Dental Exam.*, *supra*, 216 Cal. at p. 297 [corporate practice rule promotes undivided loyalty to patients] with *Garvai v. Board of Chiropractic Exmrs.* (1963) 216 Cal.App.2d 374, 377 [31 Cal.Rptr. 187]

[fictitious name requirement informs the public " 'with whom it [is] dealing' "].)

Insofar as it appears from the record, the Clinic always had a valid fictitious name permit, and Steinsmith contends that he was entitled to rely on that permit. However, the ALJ had substantial evidence from which to find that Steinsmith knew by 1995 that the Clinic's business was unlawful. The evidence shows that Steinsmith was apprised of the illegality long before he was cited, and that he nonetheless chose to continue working for the Clinic because he thought that the Board's position was wrong and represented bad policy. Thus, Steinsmith did not establish actual reliance on a valid permit.

Steinsmith's position is also untenable insofar as he can be taken to argue that the Board was required to revoke the Clinic's permit before citing him for working there. Again, running a medical clinic without a valid fictitious name permit and practicing medicine without a license are separate violations. Steinsmith cites no authority that would require the Board to prosecute these violations in any particular order. The Board's remedies against other. parties for a different violation had no bearing on its ability to discipline Steinsmith.

Steinsmith contends finally that section 2264's prohibition on the aiding of unlicensed medical practice is unconstitutionally vague as applied in his case. However, this case is a straightforward application of the well-established doctrine barring the corporate practice of medicine. Steinsmith cannot plausibly claim that he could not have been expected to know that his conduct was prohibited.

### III.

The judgment is reversed with costs to the Board.

Sepulveda, J., and Woolard, J.,* concurred.

---

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.