[Nos. A098487, A098897. First Dist., Div. Five. Jan. 21, 2004.]

TERRY LATHROP et al., Plaintiffs and Respondents, v.
HEALTHCARE PARTNERS MEDICAL GROUP, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

---

Cᴏᴜɴsᴇʟ

Horvitz & Levy, S. Thomas Todd, Tracy L. Turner; Ryan Datomi & Flores, Richard J. Ryan, Christopher A. Datomi and Robert C. Von Bargen for Defendant and Appellant.

McTernan, Stender & Weingus, Cliff Weingus; Jeffrey A. Haas Law Corporation and Jeffrey A. Haas for Plaintiffs and Respondents.

---

Oᴘɪɴɪᴏɴ

**GEMELLO, J.**—In the published portion of this medical malpractice action, we decide that a medical group consisting of a partnership of physicians is not a "health care provider" as that term is defined under the Medical Injury Compensation Reform Act (MICRA), because the medical group is not itself licensed to practice medicine. Nevertheless, we further conclude that the medical group is subject to the $250,000 cap on noneconomic damages set by MICRA (Civ. Code, § 3333.2) as an employer held vicariously liable for the negligent acts of its licensed physician employees. The trial court ruled that the medical group did not qualify for the damages limitation. We disagree and order the judgment modified.

FACTS

In March 1998 plaintiff Terry Lathrop, then age 38, was living in Southern California and was treated by three separate physicians from Bay Shores Medical Group after she felt a lump in her breast. Initially, Terry Lathrop was seen by Dr. Jon Friedman, her primary care physician, who ordered an ultrasound. The ultrasound was interpreted by Dr. Mark Diamond, a diagnostic radiologist, who concluded the lump was a benign cyst. Dr. Friedman then referred Terry Lathrop to a surgeon from Bay Shores Medical Group, Dr. Steven Rapaport. Dr. Rapaport reviewed the ultrasound report and examined Terry Lathrop. He believed the lump was a cyst that was too small to aspirate; he did not recommend a biopsy. He recommended annual screening mammograms and monthly self-examinations. Dr. Friedman agreed with Dr. Rapaport's assessment. None of the physicians from Bay Shores Medical Group ordered a diagnostic mammogram.

During this time period, Bay Shores Medical Group merged with HealthCare Partners Medical Group (HealthCare Partners). At trial, the parties

stipulated that Drs. Friedman, Diamond, and Rapaport were agents of Health-Care Partners and were acting in the course and scope of their agency when they provided medical services to Terry Lathrop.

Terry Lathrop and her family moved to Northern California later in 1998, and the roles of Drs. Friedman, Diamond, and Rapaport ended. In August 1998 Terry Lathrop was seen by a new physician, who ordered a mammogram. Dr. Bradus of Diagnostic Imaging Medical Associates prepared the mammogram report. He found several very small masses that he concluded were benign. Terry Lathrop was examined and the mammogram report was evaluated by a surgeon, Dr. Lanflisi, who concluded a biopsy was not warranted.

Nearly a year later, in June 1999, Terry Lathrop felt a new lump, which was then biopsied and found to be cancerous. Terry Lathrop underwent a mastectomy, chemotherapy, and radiation. Expert witnesses opined that she would not live more than eight years past the surgery.

## PROCEDURAL HISTORY

Terry Lathrop and her husband Douglas sued HealthCare Partners, Diagnostic Imaging, and Drs. Friedman, Diamond, Rapaport, Bradus, and Lanflisi, among others, alleging medical malpractice in the failure of these practitioners to diagnose and treat Terry Lathrop's breast cancer. Douglas Lathrop sought damages for loss of consortium.

The matter went to trial only against defendants HealthCare Partners, Diagnostic Imaging, and Dr. Lanflisi. The jury found all three defendants liable and apportioned fault as follows: HealthCare Partners, 58 percent; Diagnostic Imaging, 35 percent; Dr. Lanflisi, 5 percent; others, 2 percent.

The jury awarded Terry Lathrop $403,055 in economic damages and $2.1 million in noneconomic damages. The jury awarded Douglas Lathrop $200,000 for past loss of consortium but could not agree on future loss of consortium. In order to avoid a retrial, the parties later stipulated to the sum of $317,250 for Douglas Lathrop's future loss of consortium, bringing his total award of noneconomic damages to $517,250.

Defendant HealthCare Partners asserted early in the proceedings that the $250,000 limitation set by Civil Code section 3333.2 on noneconomic damages should be applied, and the trial court deferred ruling on the issue until after the jury's verdict. After the verdict, HealthCare Partners moved to reduce the jury's award of noneconomic damages for Terry Lathrop to

$250,000. Plaintiff conceded that the damages limitation applied to Diagnostic Imaging and Dr. Lanflisi, but objected to the application of the damages limitation to HealthCare Partners.

For the hearing on the damages limitation issue, HealthCare Partners presented evidence that it is a medical partnership owned and controlled by licensed physicians. Drs. Friedman, Diamond, and Rapaport were licensed physicians employed by the partnership at the time they treated Terry Lathrop.

After briefing and argument, the trial court ruled that HealthCare Partners was *not* eligible for the protections of Civil Code section 3333.2. The court entered judgment in favor of Terry Lathrop for $1,871,055, consisting of $403,055 in economic damages plus $1.218 million in noneconomic damages from HealthCare Partners (58 percent of $2.1 million), $218,750 in noneconomic damages from Diagnostic Imaging (35/40 of $250,000), and $31,250 in noneconomic damages from Dr. Lanflisi (5/40 of $250,000). Judgment was later entered in favor of Douglas Lathrop for $517,250 in noneconomic damages, with HealthCare Partners responsible for 58 percent or $300,005.

HealthCare Partners appeals and challenges the trial court's decision not to apply the $250,000 damages cap to the two separate judgments entered in favor of Terry Lathrop and Douglas Lathrop. We consolidated the two appeals.

## DISCUSSION

### I. *Limitation on Damages*

■ The Medical Injury Compensation Reform Act (MICRA) was enacted in 1975 in response to what the Legislature perceived as a medical malpractice insurance crisis that threatened the quality of health care in the state. (*Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 158 [211 Cal.Rptr. 368, 695 P.2d 665]; *American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 363–364, 371–372 [204 Cal.Rptr. 671, 683 P.2d 670].) MICRA includes a variety of provisions calculated to reduce the costs of medical malpractice insurance by limiting the amount and timing of recovery in cases of professional negligence. (Stats. 1975, 2d Ex. Sess. 1975, ch. 1, pp. 3949–3978; e.g., Bus & Prof. Code, § 6146 [limiting contingency fees]; Civ. Code, § 3333.1 [allowing evidence of collateral source payments]; Code Civ. Proc., § 667.7 [authorizing periodic payments for future damages]; see also Code Civ. Proc., §§ 340.5 [shortening limitations period], 364 [requiring advance notice of lawsuit].) The provision at issue here is section 3333.2 of the Civil Code, which limits noneconomic

damages in medical malpractice lawsuits to $250,000. Our Supreme Court has upheld the constitutionality of that statute, finding it "rationally related to the objective of reducing the costs of malpractice defendants and their insurers." (*Fein v. Permanente Medical Group, supra,* 38 Cal.3d at p. 159.) In so holding, the court observed that the $250,000 limit was intended to cure the problem of unpredictability in the size of noneconomic damage awards by providing "a more stable base on which to calculate insurance rates." (*Id.* at p. 163.)

### A. *Defendant is not a health care provider under MICRA*

The $250,000 limitation on damages set by Civil Code section 3333.2, like the other aspects of MICRA, applies to lawsuits brought against "a health care provider." The text of the statute reads as follows: "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, . . . and other nonpecuinary damage. [¶] (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000). [¶] (c) For the purposes of this section: [¶] (1) *'Health care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code . . . ; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with section 1200) of the Health and Safety Code.* 'Health care provider' includes the legal representatives of a health care provider; [¶] (2) 'Professional negligence' means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (Italics added.)

In brief, Civil Code section 3333.2 applies to two basic categories of health care providers: licensed practitioners and licensed facilities. In the present case, HealthCare Partners has chosen not to rely upon the second category of health care providers; it made no claim below that it qualifies as a "clinic, health dispensary, or health facility" licensed under the Health and Safety Code. A clinic is defined by the Health and Safety Code as an establishment providing direct outpatient health services. (Health & Saf. Code, § 1200.) There was evidence that HealthCare Partners provided outpatient health services to Terry Lathrop, but the trial court ruled that HealthCare Partners had failed to show it qualified as a clinic. On appeal, HealthCare Partners has eschewed its status as a clinic, health dispensary, or health facility and does not challenge the trial court's ruling on this point.

Accordingly, we do not reach the question whether HealthCare Partners comes within the statutory definition of "health care provider" as a licensed facility. Our analysis is confined to whether HealthCare Partners qualifies under the first category of health care providers, as a licensed practitioner.

■ Our reading of the statutory language leads us to conclude that HealthCare Partners does not qualify under the category of a licensed practitioner. The statutory definition refers to "any *person*." While a "person" includes a corporation as well as a natural person (Civ. Code, § 14), there is no clear indication that a "person" includes an unincorporated group or partnership. In any event, the definition of "health care provider" extends only to a "person *licensed*" under the Business and Professions Code. The Business and Professions Code sets out the licensing provisions pertaining to medicine in the Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.), and that act is quite explicit that "only natural persons shall be licensed" to practice medicine. (Bus. & Prof. Code, § 2032.) Indeed, licenses are issued to physicians who meet certain educational requirements. (Bus. & Prof. Code, §§ 2050, 2089–2096.) Only a natural person can complete medical training. Furthermore, the license authorizes a physician to "use drugs or devices in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, and other physical and mental conditions." (Bus. & Prof. Code, § 2051.) Only a natural person can perform such acts. The concept of medical licensing would be nullified if such practices could be performed by a legal entity using agents of its own choosing. The Medical Practices Act clearly intends only individual persons to be licensed to practice medicine.

■ Distinct from the concept of medical licensing is the concept of conducting a medical business. Historically, in order to protect the public from possible commercial exploitation, physicians were barred from taking a salary from a for-profit corporation or other artificial legal entity. (Bus. & Prof. Code, § 2400; *People v. Pacific Health Corp.* (1938) 12 Cal.2d 156, 158–159 [82 P.2d 429]; see *California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 547–550 [94 Cal.Rptr.2d 194] [rule does not apply to nonprofit teaching hospitals]; *County of Los Angeles v. Ford* (1953) 121 Cal.App.2d 407, 413–414 [263 P.2d 638] [rule does not apply to county hospital].) More recently, however, physicians have been statutorily authorized to conduct their medical practices in the *form* of a medical corporation, group, or partnership as long as the shareholders or partners and the employees rendering professional services are themselves licensed. (Bus. & Prof. Code, §§ 2402, 2406, 2415, 2416; Corp. Code, §§ 13401, 13405.) An artificial legal entity needs a *permit* from the Division of Licensing in order to conduct the business under a fictitious name (Bus. & Prof. Code, § 2415), and HealthCare Partners had such a permit. But having authority to conduct business as an artificial entity is not the same as having a license to practice

medicine. Again, only natural persons are *licensed* to practice medicine. (Bus. & Prof. Code, § 2032.) Because HealthCare Partners is not itself a medically licensed person, it does not qualify as a "health care provider."

The MICRA cap on noneconomic damages applies only in an action for "professional negligence," which is defined as an act or omission "*by* a health care provider *in the rendering of professional services,* which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are *within the scope of services for which the provider is licensed . . . .*" (Civ. Code, § 3333.2, subd. (c)(2); italics added.) Here, the professional services that proximately caused plaintiff's injury were those rendered by Drs. Friedman, Diamond, and Rapaport in failing to diagnose and treat plaintiff's breast cancer. They were the persons medically licensed. HealthCare Partners is not itself licensed to practice medicine—nor could it be—and therefore could not have rendered services "within the scope of services for which the provider is licensed."[1] The health care providers in this case were the physicians, Drs. Friedman, Diamond, and Rapaport.

Our conclusion that HealthCare Partners does not qualify as a "health care provider" under MICRA does not end our inquiry, however. We must next examine whether the doctrine of respondeat superior dictates that Civil Code section 3333.2 should be applied to HealthCare Partners as the employer of Drs. Friedman, Diamond, and Rapaport, who were the actual health care providers. We conclude that it does.

B. *MICRA applies to an employing entity held vicariously liable for the professional negligence of its agents*

Under the common law doctrine of respondeat superior, a principal or employer is vicariously liable for the acts of an agent or employee committed in the course of employment.[2] (*Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 959–960 [88 Cal.Rptr. 188, 471 P.2d 988].) Drs. Friedman, Diamond, and Rapaport were initially named as parties in the lawsuit, but they were dismissed as defendants before trial. Trial proceeded against the partnership, HealthCare Partners.

The jury was told that the parties stipulated that Drs. Friedman, Diamond, and Rapaport were agents of HealthCare Partners and were acting within the scope of their agency when they provided medical services to Terry Lathrop. Further, the jury was instructed as follows: "It is established that Dr. Jon

---

[1] We emphasize that we do not reach the question whether HealthCare Partners could qualify as a health care provider under MICRA as a licensed *facility.*

[2] Likewise, by statute, a general partnership is liable for the acts of a partner committed in the course of the partnership's business. (Corp. Code, § 16305.)

Friedman, Dr. Mark Diamond, and Dr. Steven Rapaport were agents of HealthCare Partners Medical Group. Therefore, any act or omission of Dr. Jon Friedman, Dr. Mark Diamond, or Dr. Steven Rapaport was in law the act or omission of defendant HealthCare Partners Medical Group." The jury was instructed on negligence, but the only instructions given on duty of care pertained to the duties of physicians. It is clear from the instructions, as well as the evidence and the closing arguments made to the jury, that the liability of HealthCare Partners in this case was solely vicarious, based upon the negligence of its physician employees.

We are not persuaded by plaintiffs' argument that the evidence showed and the jury found direct negligence of HealthCare Partners based on its negligent failure to disseminate the protocol. The argument is based upon evidence that neither Dr. Friedman nor Dr. Rapaport was aware of HealthCare Partners' written protocol regarding mammograms. Only Dr. Diamond, the radiologist, was aware of it. That protocol required that for any patient with clinically palpable breast masses, a mammogram appointment be set within three days of request. It was a protocol written by a technician of the radiology department having to do with the scheduling of appointments. It had no bearing on the medical judgment of a physician on whether to request a mammogram in the first place.

Plaintiffs' evidence at trial was that Drs. Friedman, Diamond, and Rapaport breached the standard of care by inadequately examining Terry Lathrop, failing to order a mammogram or biopsy, and misdiagnosing her cancerous lump as a cyst. Plaintiffs' attempt to argue the institutional negligence of HealthCare Partners by relying on the written protocol was curtailed by the trial court.[3] The jury instructions on negligence were confined to the duty of care of physicians; there were no instructions on institutional negligence. The only reference to the liability of HealthCare Partners came in the instructions on agency and vicarious liability. In sum, there was no basis for a jury finding of direct negligence by HealthCare Partners as an entity. Clearly, HealthCare Partners was held vicariously liable for the professional negligence of rs. Friedman, Diamond, and Rapaport under the doctrine of respondeat superior.

The key question before us is whether the MICRA cap on noneconomic damages extends not only to health care providers but also to defendants held vicariously liable for the professional negligence of a health care provider under the doctrine of respondeat superior. We begin by reviewing some fundamental principles of vicarious liability.

---

[3] During closing argument, counsel for plaintiffs asserted that the written protocol was a representation to the public that every female patient of HealthCare Partners with a palpable breast mass would get a mammogram. Upon objection by HealthCare Partners, the trial court sustained the objection on the basis that the argument misstated the evidence and the court admonished the jury to disregard counsel's statement, finding no evidence to support it.

 Under the doctrine of respondeat superior, the vicarious liability of an employer or principal is not based on fault. The liability is imposed as a rule of policy, "a deliberate allocation of a risk," regardless of the employer's control or fault. (*Hinman v. Westinghouse Elec. Co., supra,* 2 Cal.3d at pp. 959–960; see also *Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967 [227 Cal.Rptr. 106, 719 P.2d 676].) The employer's liability is wholly derived from the liability of the employee. The employer cannot be held vicariously liable unless the employee is found responsible. (*Bradley v. Rosenthal* (1908) 154 Cal. 420, 425–427 [97 P. 875]; *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1347 [100 Cal.Rptr.2d 446]; *Perez v. City of Huntington Park* (1992) 7 Cal.App.4th 817, 819–820 [9 Cal.Rptr.2d 258]; *Davison v. Diamond Match Co.* (1935) 10 Cal.App.2d 218, 221–224 [51 P.2d 452]; see *Cox v. Certified Grocers of Cal., Ltd.* (1964) 224 Cal.App.2d 26, 33 [36 Cal.Rptr. 48].)

That is not to say, however, that the employer and employee must be joined in the action as codefendants. The two may be sued separately, and the employer may be held vicariously liable without a judgment against the employee personally. (*Perez v. City of Huntington Park, supra,* 7 Cal.App.4th at p. 820; see *Freeman v. Churchill* (1947) 30 Cal.2d 453, 461 [183 P.2d 4]; *Gardner v. American Brake etc. Co.* (1944) 24 Cal.2d 686, 692 [151 P.2d 122].)

 Because the vicarious liability of the employer is wholly dependent upon or derived from the liability of the employee, any substantive defense that is available to the employee inures to the benefit of the employer. (*Freeman v. Churchill, supra,* 30 Cal.2d at p. 461 [contributory negligence of the plaintiff].) An employer cannot be held vicariously liable for an amount of compensatory damages that exceeds the amount for which the employee is liable. The Restatement of Agency expresses the rule as follows: "If the action is based solely upon the tortious conduct of the agent, judgments on the merits for the agent and against the principal, or judgments of varying amounts for compensatory damages are erroneous." (Rest.2d Agency, § 217B.)

For example, in *Daniel v. Jones* (1934) 140 Cal.App. 145 [35 P.2d 198], the trial court entered judgments for the two plaintiffs against the employee for $3,000 and $12,000 and against the employer for $3,341.50 and $15,000. On appeal, the court modified the judgments to make the judgments against the employer exactly the same as the judgments against the employee. "Since there can be but one verdict for a single sum against the driver and his employer [citation], and since the liability of the latter arises solely by reason of the detriment caused by the former, the judgments against defendant corporation will be reduced to conform to the judgments against defendant

Jones." (*Id.* at p. 147; see also *Ponce v. Tractor Supply Co.* (1972) 29 Cal.App.3d 500, 505, 510 [105 Cal.Rptr. 628] [$180,000 judgment against employer reduced to $150,000, the amount of default judgment against employee]; *Campbell v. Security Pac. Nat. Bank* (1976) 62 Cal.App.3d 379, 387 [133 Cal.Rptr. 77]; to the same effect, see *Gardner v. American Brake etc. Co., supra,* 24 Cal.2d at p. 691 [error to deny a new trial to the employer when new trial had been granted to the employee for excessive damages].)

■ This limitation on the amount of damages imposed vicariously upon the employer seems to be rooted in the concept of equitable indemnification. An employer held vicariously liable for the tort of an employee under the doctrine of respondeat superior is entitled to equitable indemnity from the employee. (*Popejoy v. Hannon* (1951) 37 Cal.2d 159, 173 [231 P.2d 484]; *Bradley v. Rosenthal, supra,* 154 Cal. at p. 426.) Limiting the damages imposed on a vicariously liable employer to the exact amount that could be recovered from the employee serves to ensure that the employee is not required to reimburse the employer for more than his own liability to the injured party. Likewise, the limitation on damages assures that the employer is able to recover the full amount of his own liability and is not left short. (Rest.2d Agency (appen.), § 217B, reporters notes, pp. 297–298.)

■ We see no reason why these settled principles on vicarious liability should not be applied. Nothing in MICRA reflects any legislative intention to abrogate the common law rules related to the doctrine of respondeat superior. Accordingly, we conclude that the liability of HealthCare Partners, as employer or principal, is limited to the liability of its employees or agents, Drs. Friedman, Diamond, and Rapaport. Under Civil Code section 3333.2, HealthCare Partners cannot be held vicariously liable for noneconomic damages in excess of $250,000.

We reject the argument made by plaintiffs that the rule limiting damages from a vicariously liable employer applies only when a judgment is also entered against the employee. It is true that the California cases illustrating the limit on damages have all involved judgments actually entered against the employee. (*Campbell v. Security Pac. Nat. Bank, supra,* 62 Cal.App.3d 379; *Ponce v. Tractor Supply Co., supra,* 29 Cal.App.3d 500; *Daniel v. Jones, supra,* 140 Cal.App. 145 [35 P.2d 198].) In those cases, it was the judgment that defined the limits of employee (and, hence, employer) liability. In the present case, in contrast, the limit of the employees' liability is defined by statute, not by a judgment. The difference is one without legal distinction. A judgment against the employee is not a requisite for vicarious liability of the employer. The employer's liability is based upon and derived from the employee's liability. The rationale for limiting damages operates to the same effect whether the limitations on the employee's liability are set by the judgment or by statute. In either event, the employer can have no greater liability than the employee.

Our conclusion finds support in *Palmer v. Superior Court* (2002) 103 Cal.App.4th 953 [127 Cal.Rptr.2d 252], a case involving the restrictions contained in section 425.13 of the Code of Civil Procedure on pleading punitive damages against health care providers. The definition of "health care provider" in that statute is the same definition used in MICRA. In *Palmer,* the plaintiff was a patient suing his HMO and the medical group that served as his primary care provider (SRS), claiming that the defendants should have approved a replacement of his leg prostheses. The conduct giving rise to the lawsuit was not the negligent treatment of the patient but SRS's rendition of "utilization review" services to the HMO in determining that the replacement prostheses were not medically necessary. There was no question in that case that the pleading restrictions applied to the plaintiff's examining physician, Dr. Rivkin, but the physician had been dismissed from the lawsuit. The appellate court observed that Dr. Rivkin had acted as shareholder and representative of SRS and therefore SRS would be vicariously liable and entitled to the same pleading restrictions applicable to its agent, Dr. Rivkin. (*Id.* at p. 972.)

In further support of our determination that Civil Code section 3333.2 should apply to a vicariously liable employer, we are guided by the analysis in *Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100 [32 Cal.Rptr.2d 263, 876 P.2d 1062], in which the Supreme Court held the cap on noneconomic damages applicable in an action for partial equitable indemnification based on professional negligence. In *Western Steamship,* a ship owner (strictly responsible under maritime law for an employee's medical care) paid a $6 million settlement to an injured employee and then sought indemnity from a hospital, which was found 30 percent at fault on account of its negligent medical treatment. The trial court declined to apply the $250,000 limit of Civil Code section 3333.2 and instead entered judgment against the hospital for $1.8 million (30 percent of the $6 million settlement). On appeal by the hospital, the Supreme Court reversed and held that the health care provider was entitled to the benefit of the MICRA limit on noneconomic damages.

In so holding, the court reviewed the policies and purposes behind MICRA and concluded that exempting indemnity actions from the $250,000 limit would threaten the Legislature's intent to control the size of noneconomic damage awards. (*Western Steamship, supra,* 8 Cal.4th at p. 112.) Further, the court examined the common law principles of equitable indemnification, emphasizing that the indemnitor is entitled to invoke whatever defenses could be raised against the injured party: " '[T]here can be no indemnity without liability.' [Citations.] Indemnity does not invariably follow fault; it is premised on a joint legal obligation to another for damages. Accordingly, as against the indemnitee, the indemnitor can invoke any substantive defense to liability that would be available against the injured party. . . . [An indemnity

claim] is wholly derivative and subject to whatever immunities and other limitations on liability would otherwise be available." (*Id.* at pp. 114–115.) The court then held that because Civil Code section 3333.2 serves as a limit on the liability of a health care provider, it also limits joint liability, and concurrent tortfeasors have no right to indemnity in excess of $250,000. "To hold otherwise would undermine the Legislature's express limit on health care liability for noneconomic damages as well as jeopardize the purpose of MICRA to ensure the availability of medical care." (*Western Steamship, supra,* at p. 116.)

In a footnote, the court clarified that the absence of the health care provider from the injured employee's underlying action was irrelevant: "A non-MICRA tortfeasor should not be entitled to greater indemnity simply because the health care defendant was not a party to the underlying negligence action in which it could have asserted the limitation of section 3333.2 simultaneously against the injured plaintiff and the indemnitee." (*Western Steamship, supra,* 8 Cal.4th at p. 116, fn. 12.)

In the case before us, we are dealing not with concurrent tortfeasors and equitable indemnification but with respondeat superior and vicarious liability. Nevertheless, the principles at issue here are substantially similar to those in *Western Steamship Lines,* and we employ much the same reasoning used by the Supreme Court in that case. As is true for equitable indemnity, vicarious liability of an employer is not based on fault and is wholly derivative. There can be no vicarious liability in a medical malpractice action without the underlying liability of the medical practitioner. Hence, as against the injured plaintiff, the employer is entitled to invoke whatever limitations on liability are available to the employee health care provider. HealthCare Partners, as the employer of Drs. Friedman, Diamond, and Rapaport, is entitled to invoke the damages cap on noneconomic damages available to the physicians under Civil Code section 3333.2. Exempting vicariously liable defendants from the $250,000 damages cap would undermine the legislative goal of replacing unpredictable jury awards with an across-the-board limit. Plaintiffs would need only to sue the entity employing the negligent physician to circumvent the MICRA cap. In order to preserve the purposes and policies of MICRA, the $250,000 limit on noneconomic damages imposed by Civil Code section 3333.2 must be applied to actions against the employers of health care providers based on respondeat superior just as the limit is applied to actions against health care providers directly.

In deciding to deny application of Civil Code section 3333.2, the trial court relied on *Flores v. Natividad Medical Center* (1987) 192 Cal.App.3d 1106 [238 Cal.Rptr. 24]. We see the case as inapposite. The plaintiff in *Flores* sued doctors, a hospital, and the State of California for injuries he sustained while in prison. The doctors were held liable for negligent medical treatment, and

no challenge was made to the application of Civil Code section 3333.2 as to them. (*Flores* at pp. 1110–1111.) With respect to the State of California, on the other hand, the appellate court held the $250,000 damages cap should not have been applied, because the cause of action against the State was not for medical malpractice but for failure to summon medical aid. (*Id.* at pp. 1114–1116.) Since the State was immune from suit for its employees' negligence, it could not be held vicariously liable for the doctors' malpractice. (*Id.* at pp. 1115, 1116.) The *Flores* decision does not contradict our holding that MICRA applies to an employing entity held vicariously liable for the professional negligence of its agents.

### C. *Whether defendant is a managed care entity is irrelevant*

The parties and amici curiae have posed the question whether the application of MICRA to HealthCare Partners on account of its vicarious liability is affected by the fact that HealthCare Partners furnished medical care to plaintiff Terry Lathrop pursuant to a contract with plaintiffs' health care insurance plan. We conclude that the circumstance has no affect.

The evidence at trial was that Terry Lathrop had medical insurance benefits from Health Net through her husband's employer; Health Net paid her medical expenses except for a small copayment. The actual medical services were provided by HealthCare Partners. Dr. Friedman was Terry Lathrop's primary care physician at HealthCare Partners. At the postverdict hearing on the application of MICRA, HealthCare Partners acknowledged that it was a contract service provider to Health Net.

In support of the trial court's decision to deny application of Civil Code section 3333.2 to HealthCare Partners, plaintiffs rely on Civil Code section 3428, subdivision (c), which declares that health care service plans and *managed care entities* are not health care providers under any provision of law, including Civil Code section 3333.2. Plaintiffs contend that HealthCare Partners is a "managed care entity" under Civil Code section 3428, excluded therefore from the definition of "health care provider" and not protected by MICRA.

The trial court was persuaded by this argument, but we do not reach it. We have concluded that HealthCare Partners is not a health care provider as defined by Civil Code section 3333.2, though it is entitled to the limitation on damages by reason of its vicarious liability for the malpractice of its

employees. If there is another reason to find that HealthCare Partners is not a health care provider under Civil Code section 3333.2, it is not necessary for our decision.[4]

II. *Postverdict Settlement**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The matter is· remanded to the trial court with directions to modify the judgment in accordance with Civil Code section 3333.2. As so modified, the judgment is affirmed. In the interests of justice, each side is to bear its own costs.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied February 11, 2004, and the opinion was modified to read as printed above.

---

[4] We have been asked to take judicial notice of the legislative history of Health and Safety Code section 1371.25. We find no need to do so, and the request is denied. We likewise deny the request by amicus curiae, the Permanente Medical Groups, for judicial notice of the legislative history relating to MICRA and Civil Code section 3428. And we deny the request of plaintiffs for judicial notice of various materials from another lawsuit.

*See footnote, *ante*, page 1412.