[No. D040486. Fourth Dist., Div. One. Nov. 19, 2002.]

WILLIAM PALMER, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SHARP REES-STEALY MEDICAL GROUP, INC., Real Party in Interest.

**COUNSEL**

Mitchel J. Olson for Petitioner.

Robinson, Calcagnie & Robinson, and Sharon J. Arkin, for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioner.

Thelen Reid & Priest, Curtis A. Cole, Kenneth R. Pedroza, John L. Tuell; Higgs, Fletcher & Mack, Richard D. Barton and Loren G. Freestone for Real Party in Interest.

Horvitz & Levy, S. Thomas Todd and Julie L. Woods for California Medical Association, California Healthcare Association and California Dental Association as Amici Curiae on behalf of Real Party in Interest.

Kennedy P. Richardson; David J. Lerman; Pauline Fox; and W. William Petrick for The Permanente Medical Group and Southern California Permanente Medical Group as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**HUFFMAN, J.**—Petitioner William Palmer, plaintiff in an underlying action against his health maintenance organization, PacifiCare of California (PacifiCare or the HMO) and the medical group that is his primary health care provider, Sharp Rees-Stealy Medical Group, Inc. (SRS), seeks a writ of mandate setting aside an order of the superior court that struck his allegations of entitlement to punitive damages against SRS. Palmer contends the trial court misinterpreted the protective provisions of Code of Civil Procedure[1] section 425.13, which require an order to amend a pleading to add claims for punitive damages against health care providers. In Palmer's view, these provisions should not apply to SRS in the capacity in which it acted concerning his case, as a utilization review service provider to the PacifiCare HMO, rendering advice to the HMO about whether requested medical services, equipment, or supplies were "medically necessary" within the terms of the PacifiCare plan. Palmer questions whether (1) SRS, a medical group, qualifies as a health care provider within the definitions of the statute, and (2) whether his particular allegations of intentional infliction of emotional distress "arise out of" the professional negligence of such a health care provider, again under the statutory definitions. (§ 425.13, subds. (a), (b).)

When we examine the allegations that identify the nature and cause of the injuries that are claimed, we determine as a matter of law that they are directly related to the manner in which professional services were provided in this health care context, as it is affected by MICRA public policies.[2] *(Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 192 [10 Cal.Rptr.2d 208, 832 P.2d 924] *(Central Pathology)*;

---

[1] All statutory references are to this code unless otherwise stated.

[2] The Medical Injury Compensation Reform Act (MICRA), is comprised of a number of statutes implementing the policy of containing the costs of malpractice insurance "by controlling or redistributing liability for damages, thereby maximizing the availability of medical services to meet the state's health care needs. [Citation.]" *(Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 112 [32 Cal.Rptr.2d 263, 876 P.2d 1062]; see, e.g., § 340.5; Civ. Code, §§ 3333.1, 3333.2.)

*Williams v. Superior Court* (1994) 30 Cal.App.4th 318, 324-325 [36 Cal.Rptr.2d 112] (*Williams*).) Accordingly, compliance with the requirements of section 425.13 was required, and we deny the petition for relief.

FACTUAL AND PROCEDURAL BACKGROUND[3]

"In the early 1990's, Palmer suffered from a bacterial disease, complications of which caused him to lose both legs below the knee, four fingers on his left hand and 45 percent of his skin. As a result of this, Palmer needs leg prostheses to walk. Palmer is a part-time school teacher for the Poway Unified School District and, through the district, is covered by a health care service plan managed by PacifiCare. . . .

"In January 2000, Palmer's prosthetist, Justin Norton, concluded that Palmer's prostheses needed to be replaced. (All relevant dates are in 2000.) In a letter addressed to Dr. Jonathan Rivkin, a physician in Sharp Rees-Stealy Medical Group, Inc. (SRS) who is Palmer's primary care provider, Norton recommended the use of newly-available (ultra light) prostheses based on Palmer's 'active lifestyle.' At Dr. Rivkin's request, Norton prepared a cost estimate, indicating that the recommended prostheses would cost $18,438.02." (Prior opn., *supra,* D037772.)

Palmer's complaint further alleges there is an agreement between PacifiCare and SRS pursuant to which SRS provides medical services to PacifiCare members in return for a negotiated monthly rate paid per member. SRS employs physicians and other health care providers and owns and operates health care equipment and facilities. Palmer also alleges there is an agreement between PacifiCare and SRS pursuant to which SRS provides "utilization review" services to PacifiCare, "including making decisions as to whether requested medical services, equipment, and supplies for PacifiCare members are 'medically necessary.' " Services that are not medically necessary are not covered by the HMO subscriber agreement.

On February 7, 2000, an SRS employee from Dr. Rivkin's office called Palmer's prosthetist Norton to inform him that the request for new prostheses had been approved as medically necessary, and the request was being forwarded to the SRS utilization review department. However, Palmer then received a letter from SRS notifying him that the request had been denied on the basis that the SRS "medical director" had determined that the requested

---

[3]A portion of these background facts is quoted from a prior opinion issued by this court in a previous mandamus proceeding, setting aside an order compelling Palmer to arbitrate his dispute with PacifiCare. (*Palmer v. PacifiCare* (Dec. 24, 2001, D037772) [nonpub. opn.] (prior opinion).)

prostheses were not a "medical necessity." Palmer was referred to the PacifiCare standard appeal process.

On March 31, 2000, Dr. Rivkin contacted Norton to tell him that Palmer's request for new prostheses was jeopardizing Palmer's disability status with his disability insurer, because the level of activity Palmer represented that he participated in, to support his request for new prostheses, could cause the insurance carrier to conclude he was not disabled. Norton responded that the requested prostheses were medically necessary, in his opinion. Palmer alleges that in making this contact, Rivkin acted as an agent for SRS and PacifiCare to further their attempts to avoid paying for a service that was medically necessary under the subscriber agreement.

Thereafter, on a Sunday, April 2, Dr. Rivkin called Palmer at home and stated that he was being pressured by PacifiCare and SRS to deny that the new prostheses requested by Palmer were medically necessary. Dr. Rivkin explained to Palmer that SRS received a fixed sum from PacifiCare for providing medical services and that the costs of the prostheses greatly exceeded the total payments SRS received for providing Palmer with care. Dr. Rivkin also told Palmer that if Palmer persisted with the appeal, he was under instructions from PacifiCare and SRS to send a letter to Palmer's disability insurer questioning whether Palmer was in fact disabled. Palmer replied that he intended to continue with the PacifiCare appeal, and that the representations he had previously made to support his disability claims were accurate and true.

Shortly thereafter, Dr. Rivkin prepared a letter clarifying that he believed standard prosthetic devices were medically necessary for Palmer. The letter expressed concern, however, about Norton's recommendation that Palmer needed ultra light prostheses to support Palmer's active lifestyle, in light of Palmer's assertions to Rivkin, in connection with applying for disability compensation, that Palmer had limited mobility and was unable to stand or walk for more than 30 minutes. At Palmer's request, Dr. Rivkin sent Palmer a copy of his letter.

On April 10, PacifiCare sent Palmer a letter notifying him that it upheld the denial of his request for ultra light prostheses, but authorized revision of the stump sockets on his existing prostheses. The letter informed Palmer that he had the right to seek further review by PacifiCare's appeals and grievance review committee. Shortly thereafter, Palmer called PacifiCare to initiate such a review. The PacifiCare review process proceeded through September 2000, when Palmer wrote PacifiCare to complain that he had complied with their request to get a second opinion in July 2000, but no decision had been

made by the PacifiCare medical director by the end of August or September, as had been promised.

Subsequently, Palmer filed this action against PacifiCare, SRS and Dr. Rivkin. As against PacifiCare, the main allegation is breach of the implied covenant of good faith and fair dealing in the subscriber agreement, with respect to the denial of the requested medical services and equipment. Also, intentional and negligent infliction of emotional distress are alleged. As against SRS, both intentional and negligent infliction of emotional distress are alleged, due to the manner in which plaintiff's request for the medical services and equipment was processed.[4] Palmer claims SRS intentionally and willfully found that the prostheses were not medically necessary when they were, in fact, medically necessary, and further, SRS physician Rivkin warned Palmer that a letter could be sent to Palmer's disability insurer questioning whether he was actually disabled.

As already noted, in a previous mandamus proceeding, this court set aside an order compelling Palmer to arbitrate his dispute with PacifiCare. On the return of the case to the trial court, SRS renewed a prior motion to strike the allegations of punitive damages, which had not been heard when filed. SRS argued the allegations of punitive damages were premature and improper pursuant to section 425.13, subdivision (a), because this was an action for damages arising out of the professional negligence of a health care provider, and the plaintiff had failed to obtain an order allowing an amended pleading that included these claims for punitive damages.

In its order granting the motion, the trial court first found that SRS is a health care provider under the statute, as an organized outpatient health facility which provides direct medical or podiatric advice, services, or treatment to patients. (§ 425.13, subd. (b).) The trial court also found that under *Central Pathology, supra*, 3 Cal.4th 181, 191, the allegations made against SRS were "directly related to the professional services provided by Dr. Rivkin and/or other Sharp medical personnel, acting in their capacities as health care providers." Specifically, the court's ruling stated: "Plaintiff alleges that 'Sharp provides medical services to PacifiCare members . . .' and provides 'utilization review' services to PacifiCare, including making decisions as to whether requested medical services, equipment, and supplies for PacifiCare are 'medically necessary.' [Citation.] Only physicians or other

---

[4]As a result of the trial court's orders sustaining demurrers as to the causes of action brought against Dr. Rivkin, and plaintiff's failure to file an amended pleading, there are no longer any causes of action pending against Dr. Rivkin. Also, the order striking the punitive damages claims notes that there is no longer any slander cause of action pending against SRS, as originally alleged.

qualified medical personnel would be qualified to determine if an item is 'medically necessary.' The gravamen of plaintiff's complaint is that Sharp determined new prostheses were not medically necessary for him. Thus plaintiff's claims are directly related to the manner in which Sharp provided professional health care services, whether through Dr. Rivkin or Sharp's utilization review."

This petition followed, and trial was stayed pending our decision in this matter. Amici curiae briefs have been filed in support of SRS by the Permanente Medical Group, Inc., and Southern California Permanente Medical Group, as well as several associations representing health care providers, California Medical Association, California Healthcare Association, and California Dental Association. (Cal. Rules of Court, rule 13(b).)[5] The Consumer Attorneys of California have filed a similar brief on behalf of Palmer.

DISCUSSION

■ For the basic background and relationship of section 425.13 and MICRA, we turn to *Cooper v. Superior Court* (1997) 56 Cal.App.4th 744, 748-749 [65 Cal.Rptr.2d 674] (*Cooper*). Following the enactment of MICRA in 1975, the Legislature added section 425.13 in 1987 due to related policy concerns " 'that unsubstantiated claims for punitive damages were being included in complaints against health care providers.' " (*Cooper, supra,* 56 Cal.App.4th at p. 748, citing *Central Pathology, supra,* 3 Cal.4th 181, 189.) The effect of section 425.13 is to add additional protections against such claims " 'by establishing a pretrial hearing mechanism by which the court would determine whether an action for punitive damages could proceed.' [Citation.]" (*Cooper, supra,* 56 Cal.App.4th at p. 748.) The section was amended in 1988 to clarify that these protections apply to actions for damages " 'arising out of the professional negligence of a health care provider.' " (*Central Pathology, supra,* 3 Cal.4th at pp. 188-189, italics omitted.) It is well established that the legislative history of the term, "professional negligence," as found in MICRA, may be used to interpret that term as used in section 425.13, to determine the scope of conduct afforded these protections under MICRA-related provisions. (*Central Pathology, supra,* 3 Cal.4th at pp. 187, 192.) It is also well accepted that "[s]tatutory sections relating to the same subject must be read together and harmonized. [Citation.]" (*Kotler v. Alma Lodge* (1998) 63 Cal.App.4th 1381, 1394 [74 Cal.Rptr.2d 721] (*Kotler*).)

■ To determine what actions require compliance with the pleadings procedure of section 425.13, the courts will look to whether "the injury for

---

[5]We also granted a request for judicial notice of certain legislative history materials filed by the Permanente Medical Group et al., concerning whether a professional medical corporation is a health care provider within the meaning of section 425.13. (Evid. Code, § 459.)

which damages are sought is directly related to the professional services provided by the health care provider." (*Central Pathology, supra*, 3 Cal.4th at p. 191.) Stated another way, "The test of whether a health care provider's negligence constitutes professional negligence is whether the negligence occurred in rendering services for which the health care provider is licensed. [Citation.]" (*Williams, supra*, 30 Cal.App.4th at pp. 324-325.) Under the *Central Pathology* test, the focus must be upon the allegedly injurious conduct of the health care provider, and whether he or she was engaged in the practice of medicine at the time of the subject acts: Were the acts performed those that a medical practitioner ordinarily would be expected to perform in his or her capacity as a health care provider? (*Davis v. Superior Court* (1994) 27 Cal.App.4th 623, 628-629 [33 Cal.Rptr.2d 6] (*Davis*).) If so, the acts are deemed to have occurred during the rendition of medical services, and section 425.13, subdivision (a) applies. (*Davis, supra*, 27 Cal.App.4th at pp. 628-629.)

Our case presents two variations on this theme. First, does SRS, the medical group, qualify as a health care provider within the statutory definition of section 425.13, subdivision (b)? Second, do the unfavorable utilization review services that were carried out by SRS, and the related allegations of pressure being brought to bear upon the patient to withdraw a request for coverage or an appeal under the PacifiCare subscriber plan, amount to allegations of medical negligence on the part of SRS? Before we address these questions, it is important to note what this case is not about. It does not deal with the allegations of breach of the covenant of good faith and fair dealing directed against PacifiCare, a health care service plan, nor the emotional distress claims against it. Also, it should be noted that according to the order challenged in this writ proceeding, Dr. Rivkin has been dismissed as an individual defendant. Instead, we are required only to focus upon the role and conduct of SRS in these transactions.

I

*Health Care Provider Definitions: Medical Group*

As relevant here, section 425.13, subdivision (a), refers to the requirement for court approval of a claim for punitive damages in an action for damages "arising out of the professional negligence of a health care provider." Subdivision (b) provides in full: "For the purposes of this section, 'health care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section

1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider."

We first take note that several of these definitions have little or nothing to do with this case. First, we are not dealing with allegations against an osteopath or a chiropractor. The reference to section 1440 of division 2 of the Health and Safety Code is not pertinent here, as it applies to county medical facilities. Also, it is not specifically disputed that SRS is not itself a licensed "clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code," as referred to in section 425.13, subdivision (b).

Rather, the allegations against SRS are that it is a corporation which is a medical group made up of licensed physician/shareholders, and it provides clinic or health facility outpatient services. SRS operates as a medical group under a fictitious name as allowed by Business and Professions Code section 2415, subdivision (a): "Any physician and surgeon . . . , who as a sole proprietor, or in a partnership, group, or professional corporation, desires to practice under any name that would otherwise be a violation of Section 2285 may practice under that name if the proprietor, partnership, group, or corporation obtains and maintains in current status a fictitious-name permit issued by the Division of Licensing . . . under the provisions of this section."[6] Under Business and Professions Code sections 2406 and 2408, a medical corporation comprised of licensed professionals may render professional services as long as it is in compliance with the Moscone-Knox Professional Corporation Act (Corp. Code, § 13400 et seq.), which requires that only licensed persons render professional services on behalf of the corporation. (Corp. Code, §§ 13405, 13406, subd. (a).)

Palmer seeks to have this court make a narrow reading of the definition of "health care provider" as found in section 425.13, subdivision (b), to require SRS to have a separate license for itself in order to qualify under that definition. SRS responds initially that it could theoretically be considered to be a "legal representative of a health care provider" under the language found in this definition, such that it would be entitled to require a motion to amend to add punitive damages. (§ 425.13, subd. (b); but see *Flores v. Natividad Medical Center* (1987) 192 Cal.App.3d 1106, 1116-1117,

---

[6] Business and Profession Code section 2285 prohibits the use of any fictitious, false, or assumed name by a medical licensee without a fictitious name permit, and defines such use as unprofessional conduct, with some exceptions (e.g., licensed clinics or medical school facilities).

fn. 3 [238 Cal.Rptr. 24] [referring to legal representatives as "heirs"].)
Essentially, Palmer is arguing that when SRS made its utilization review recommendations to PacifiCare, it was not providing health care to a patient, but rather was rendering administrative advice to the PacifiCare HMO/insurer. Palmer characterizes SRS as an administrator of the Pacifi-Care subscriber agreement, rather than as a health care provider who would be entitled to the protection of section 425.13. He relies on *Kotler, supra,* 63 Cal.App.4th 1381, a case interpreting Civil Code section 3333.2, in which the court recognized a distinction between direct and incidental health care services in the context of MICRA. (*Kotler, supra,* 63 Cal.App.4th at pp. 1391-1394: a residential care facility licensed under a separate statutory scheme which provides only incidental medical services is not a health facility under MICRA standards; it is also not a health dispensary.) It should be noted that the record does not contain any information about the wording of the agreement between SRS and PacifiCare for the performance of utilization review services regarding PacifiCare subscribers, and hence we evaluate the language of the pleading in light of the applicable statutes only, and the circumstances of this case, to evaluate the scope of protection to be afforded under section 425.13.

There are several problems with Palmer's theory, both as to the identity of the recipient of the professional services and as to the licensing aspect. First, the case law under section 425.13 has not required the health care provider to have had a direct patient-care relationship with the plaintiff who seeks to assert a punitive damages claim against it, in order to require the amendment procedure to be utilized. Specifically, in *Williams, supra,* 30 Cal.App.4th 318, 323-324, this court noted that the terms of section 425.13 apply to " 'any action for damages arising out of professional negligence' " and are not limited to actions by the actual recipient of the professional services. Also, the definition of "professional negligence" in the section does not require the negligent act or omission to result in injury only to the patient for the section to apply. (*Williams, supra,* 30 Cal.App.4th at p. 323.) Rather, MICRA limitations may be applied in actions brought by parties other than the patient, and section 425.13 may apply "to any foreseeable injured party, including patients, business invitees, staff members or visitors, provided the injuries alleged arose out of professional negligence." (*Williams, supra,* 30 Cal.App.4th at p. 324.)

Similarly, in *Johnson v. Superior Court* (2002) 101 Cal.App.4th 869 [124 Cal.Rptr.2d 650] (*Johnson*), the Court of Appeal decided that a sperm bank qualified as a "health care provider" as that term is used in section 425.13, subdivision (b), as a "health dispensary" which is included in the definitions in that subdivision (b). Also, the doctors operating such a sperm bank "act as

health care providers when they perform genetic screening of potential sperm donors." (*Johnson, supra,* 101 Cal.App.4th at p. 873.) To do so, they had to apply medical knowledge and experience to the reported facts about donors. (*Id.* at p. 884.) It did not make any difference that there were commercial aspects to the business of the sperm bank, for purposes of applying MICRA-related limitations. Thus, a genetically damaged child conceived by use of the bank, and her parents, were not exempt from the pleading requirements of section 425.13, because their action arose out of conduct that was directly related to the provision of professional health care services, even absent a physician-patient relationship. (*Johnson, supra,* 101 Cal.App.4th at p. 885.)

Under this approach, it does not make any difference to the application of section 425.13 that SRS was acting on behalf of PacifiCare when it conducted its utilization review services by evaluating Palmer's request for medical services and equipment, to determine their medical necessity. We cannot interpret the statute on the basis of the identity of the physician-patient relationship at issue. Rather, we must look more broadly to the nature of the conduct that allegedly gave rise to the injury here. (*Central Pathology, supra,* 3 Cal.4th at p. 192.) We disagree with Palmer that *Kotler, supra,* 63 Cal.App.4th at page 1391, should be read to support a finding that the utilization review services SRS was performing amounted to only incidental medical services, such that MICRA standards would not apply. Even though utilization review services have a commercial or administrative quality of assisting in cost containment for health care service plans, any commercial aspects of those services are not dispositive in determining health care provider status. (*Johnson, supra,* 101 Cal.App.4th at p. 885.) Further, the Supreme Court has discussed the applicability of MICRA standards with respect to medical groups, such as Permanente Medical Group or, arguably, SRS, without finding a conceptual problem with MICRA policies in that context. (See *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 159-160 [211 Cal.Rptr. 368, 695 P.2d 665].)

We may find additional guidance on the licensing issue by looking to "[s]tatutory sections relating to the same subject," on the basis that they must be read together and harmonized. (*Kotler, supra,* 63 Cal.App.4th at p. 1394.) As pointed out by SRS and amici curiae, Palmer's argument that SRS should not be considered a health care provider under the punitive damages pleading statute does not find any support in a closely related statutory scheme, the Knox-Keene Health Care Service Plan Act of 1975. (Health & Saf. Code, § 1340 et seq. (the Knox-Keene Act).) PacifiCare is a health care service plan licensed and regulated under the Knox-Keene Act, and the utilization services challenged here were performed in connection with PacifiCare

claims processes. In contrast, the physician shareholders of SRS are regulated and licensed by the Medical Practice Act as medical professionals. (Bus. & Prof. Code, § 2000 et seq.; also see Corp. Code, § 13400 et seq., regulating professional medical corporations.)

In the Knox-Keene Act, a distinction is made between "health care service plans," such as an HMO like PacifiCare, and the licensed "providers" who are professional persons or organizations who deliver or furnish health care services. In the definitions section of the Knox-Keene Act, Health and Safety Code section 1345, subdivision (f), "health care service plans" are defined as either of the following: "(1) Any person who *undertakes to arrange for the provision of health care services* to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees. [¶] (2) Any person, whether located within or outside of this state, who solicits or contracts with a subscriber or enrollee in this state to pay for or reimburse any part of the cost of, or who undertakes to arrange or arranges for, the provision of health care services that are to be provided wholly or in part in a foreign country in return for a prepaid or periodic charge paid by or on behalf of the subscriber or enrollee." (Italics added.)

Also in the definitions section of the Knox-Keene Act, Health and Safety Code section 1345, subdivision (i) defines "Provider" as "any professional person, organization, health facility, or other person or institution licensed by the state *to deliver or furnish health care services*." (Italics added.) We think the role that SRS played in the utilization review function contracted for by PacifiCare is more like the "provider" definition of Health and Safety Code section 1345, subdivision (i) (delivering or furnishing services) than it is like the "health care service plan" definition of Health and Safety Code section 1345, subdivision (f) (arranging for or paying for services). As a professional medical corporation, SRS delivers health care services through licensed professionals. (Bus. & Prof. Code, § 2406; Corp. Code, § 13401, subd. (b), defining professional corporation.)

We will refer in the next portion of this opinion to another section of the Knox-Keene Act, Health and Safety Code section 1367.01, which sets forth standards for the process of review by health care service plans of the requests made by health care service providers, for health care services for the plan's enrollees. As we will next discuss, those standards require that medically trained and qualified professional persons make any medical necessity decisions, when coverage is in question. (See also Health & Saf. Code, § 1363.5, subd. (b); pt. II., *post.*)

In any case, to dispose of the issue we are currently considering, we conclude that SRS must be considered to fall under the statutory definition in

section 425.13, subdivision (b) of a health care provider, because it is a medical group comprised of licensed medical practitioners, who provide direct medical services to patients, albeit under a fictitious name. (Bus. & Prof. Code, § 2415.) The statutory scheme does not contemplate that an additional license need be obtained for the medical group itself. (Bus. & Prof. Code, §§ 2406 & 2408; Corp. Code, § 13400 et seq.) Rather, the definition in section 425.13, subdivision (b) of "health care provider" should be read broadly to implement its statutory purpose, protecting this type of health care provider, which delivers services to patients, from potentially unfounded punitive damages claims. This interpretation requires that SRS, a medical group of such providers, is entitled to the procedural protections of the section.

It does not make any difference that Palmer prefers to characterize SRS as a "subscriber agreement administrator," rather than a health care provider, or that there are administrative or financial aspects to these services. The underlying allegation is that SRS is a medical group, and the statutes reveal that this medical group is comprised of licensed professionals. (Bus. & Prof. Code, §§ 2415, 2416.) The conduct that gave rise to these claims is the SRS rendition of utilization services to PacifiCare, which are professional services performed by SRS health care providers, such as its medical director. (*Central Pathology, supra,* 3 Cal.4th at pp. 191-192; Health & Saf. Code, § 1367.01.)

Because of this preliminary conclusion, we need not address the SRS argument that under the definitions in section 425.13, subdivision (b), SRS may also be a "legal representative" of its physician/providers, who can thereby invoke the statutory pleadings procedure. (See *Flores v. Natividad Medical Center, supra,* 192 Cal.App.3d 1106, 1116-1117, fn. 3, referring to legal representatives as heirs.)

II

*Guidelines for an Action "Arising Out of Professional Negligence"*

The more difficult issue here is whether the services SRS was performing on behalf of PacifiCare, i.e., conducting utilization review services by evaluating Palmer's request for medical services and equipment to determine their medical necessity, should be characterized as "professional negligence" that could give rise to an actionable claim by Palmer for punitive damages, such that SRS can raise the procedural hurdle of section 425.13, subdivision (b). Palmer is further claiming that SRS, through its physician Rivkin, intentionally inflicted emotional distress by pressuring

him to drop his appeal and questioning his disability status. ■ As the relevant statutory terms are explained in *Williams, supra,* 30 Cal.App.4th 318, 322-323: "The terms 'professional negligence' and 'arising out of' are not defined in section 425.13. [¶] 'Professional negligence' is defined in several sections of [MICRA] as 'a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.' [Citations.] . . . The term 'arising out of' is interpreted as 'origination, growth or flow' from the event. [Citation.]"

It is well established that intentional torts may fall within the scope of pleading of such injuries allegedly arising from actions carried out in a defendant's capacity as a health care practitioner. (*Central Pathology, supra,* 3 Cal.4th at pp. 190-191; *Davis, supra,* 27 Cal.App.4th at pp. 628-629; *Cooper, supra,* 56 Cal.App.4th at pp. 748-749.) In examining the conduct giving rise to the claim, the court must ask whether the acts performed were such as a medical practitioner ordinarily would be expected to perform in his or her capacity as a health care provider. (*Davis, supra,* 27 Cal.App.4th at p. 629.)

■ Palmer's argument here is that he does not claim his injuries relate either directly or indirectly to actual health care services provided by licensed health care professionals acting in their capacity as such. Instead, he claims his injuries relate to actions taken by SRS and PacifiCare in administering the HMO subscriber agreement, and those actions operated to prevent him from receiving the requested health care services. He thus contends the policies promoted by section 425.13 (e.g., lowering medical malpractice insurance premiums) do not come into operation when the utilization review services were performed by SRS as a financial consulting service to PacifiCare, even though SRS was simultaneously providing the direct medical care to Palmer as his primary care provider.

The closely intertwined nature of health insurance coverage decisions and medical necessity diagnostic decisions was recently discussed by the United States Supreme Court in *Rush Prudential HMO, Inc. v. Moran* (2002) 536 U.S. 355 [122 S.Ct. 2151, 153 L.Ed. 375] (*Rush*), and in *Pegram v. Herdrich* (2000) 530 U.S. 211 [120 S.Ct. 2143, 147 L.Ed.2d 164] (*Pegram*). Both of these cases discussed ERISA preemption provisions, and set forth several

analyses of the HMO dual role as insurer and provider.[7] (In the *Rush* case, an Illinois statute requiring HMO's to provide independent review of disputes between primary care physicians and HMO's, and to cover services deemed medically necessary by an independent reviewer, was considered to regulate insurance within the meaning of the ERISA preemption provisions saving clause, such that no preemption occurred; other holdings need not be summarized here.) The Supreme Court observed: "Rush contends that seeing an HMO as an insurer distorts the nature of an HMO, which is, after all, a health care provider, too. This, Rush argues, should determine its characterization, with the consequence that regulation of an HMO is not insurance regulation within the meaning of ERISA. [¶] The answer to Rush is, of course, that an HMO is both: it provides health care, and it does so as an insurer." (*Rush, supra,* 536 U.S. at pp. 366-367 [122 S.Ct. at p. 2160].)

The court in *Rush,* further referred to its description in the *Pegram* case of "a feature of HMO benefit determinations," as follows: "We explained that when an HMO guarantees medically necessary care, determinations of coverage 'cannot be untangled from physicians' judgments about reasonable medical treatment.' [Citation.]" (*Rush, supra,* 536 U.S. at p. 383 [122 S.Ct. at p. 2168].)

Just as the Supreme Court acknowledged in *Rush, supra,* 536 U.S. 355 [122 S.Ct. 2151], the SRS medical director who made the disputed "lack of medical necessity" decision was acting as a health care provider as to the medical aspects of that decision. That there was also a financial coverage consequence of that decision is not dispositive for purposes of applying section 425.13 definitions of professional negligence of a health care provider. Such medical necessity decisions take place in the context of professional duties of care.

California law, in the Knox-Keene Act, requires a licensed health care service plan, such as an HMO or insurer, to adhere to certain standards in the utilization review context. (Health & Saf. Code, § 1340 et seq.) As already mentioned, Health and Safety Code section 1367.01 provides standards for the evaluation of requests by providers for certain health services on behalf of their patients: "(a) Every health care service plan and any entity with which it contracts for services that include utilization review or utilization management functions, that prospectively, retrospectively, or concurrently reviews and approves, modifies, delays, or denies, based in whole or in part on medical necessity, requests by providers prior to, retrospectively, or concurrent with the provision of health care services to enrollees, or that

---

[7]ERISA is the Employee Retirement Income Security Act of 1974, 29 United States Code section 1001 et seq.

delegates these functions to medical groups or independent practice associations or to other contracting providers, shall comply with this section. [¶] (b) A health care service plan that is subject to this section shall have written policies and procedures establishing the process by which the plan prospectively, retrospectively, or concurrently reviews and approves, modifies, delays, or denies, based in whole or in part on medical necessity, requests by providers of health care services for plan enrollees. These policies and procedures shall ensure that decisions based on the medical necessity of proposed health care services are consistent with criteria or guidelines that are supported by clinical principles and processes. . . ."[8]

Health and Safety Code section 1367.01, subdivision (e) requires that only health care professionals make these medical necessity decisions, as follows: "No individual, other than a licensed physician or a licensed health care professional who is competent to evaluate the specific clinical issues involved in the health care services requested by the provider, may deny or modify requests for authorization of health care services for an enrollee for reasons of medical necessity. The decision of the physician or other health care professional shall be communicated to the provider and the enrollee pursuant to subdivision (h)."

Health and Safety Code section 1367.01, subdivision (m) provides an express exemption from the coverage of MICRA for these health care service plans, in their operation as HMO's or insurers which make coverage decisions: "Nothing in this section shall cause a health care service plan to be defined as a health care provider for purposes of any provision of law, including, but not limited to, Section 6146 of the Business and Professions Code, Sections 3333.1 and 3333.2 of the Civil Code, and Sections 340.5, 364, 425.13, 667.7, and 1295 of the Code of Civil Procedure."[9]

---

[8]Under Health and Safety Code section 1367.01, subdivision (b), the policies and procedures for decisions based on the medical necessity of proposed health care services shall incorporate criteria and guidelines that are developed pursuant to Health and Safety Code section 1363.5. Subdivision (b) of Health and Safety Code section 1363.5 states: "The criteria or guidelines used by plans, or any entities with which plans contract for services that include utilization review or utilization management functions, to determine whether to authorize, modify, or deny health care services shall: [¶] (1) Be developed with involvement from actively practicing health care providers. [¶] (2) Be consistent with sound clinical principles and processes. [¶] (3) Be evaluated, and updated if necessary, at least annually . . . ." These provisions emphasize that medical training and clinical judgment shall be of paramount importance in the medical necessity decisions conducted in utilization review.

[9]As an aside, SRS refers to new Civil Code section 3428, enacted in 1999, effective in 2000, and applicable to services rendered on or after January 1, 2001, the Managed Health Care Insurance Accountability Act (Historical and Statutory Notes, 12A West's Ann. Civ. Code (2002 supp.) foll. § 3428, p. 10). This statute is consistent with the well-accepted distinction between health care service plans and health care providers. It imposes on a health

From these provisions, we may conclude that the Legislature recognizes that health care services plans, such as HMO's and insurers, have different roles to play in the delivery of health care services than do health care providers. Health care service plans may conduct utilization reviews, but they must do so within regulatory standards requiring the application of medical knowledge and clinical judgment. (Health & Saf. Code, § 1367.01, subd. (e).) At various times, health care providers may deal directly with patients, or they may be required to make medical necessity determinations through review of records. Certainly, as Palmer posits in his opposition to the motion to strike at the trial court level, the possibility of conflicting loyalties can arise; we quote from that filing: "Utilization review is for the benefit of an HMO in controlling costs . . . . In fact, a physician involved in the utilization review process is caught in the conflict of interest between the HMO's financial interest in minimizing expenditures on behalf of a patient and the patient's interest in maximizing the health services potentially beneficial to him." Although we recognize this is a valid and serious policy concern, we are restricted to deciding the narrow question before us, as to the applicability of section 425.13 and its procedural protections for health care providers for conduct in their capacity as such.[10]

Returning to the nature of the allegations against SRS, they take two basic forms. First, Palmer claims the SRS medical director's medical necessity determination, as made in this utilization review, caused intentional infliction of emotional distress on which he bases his punitive damages allegations. Secondly, Palmer alleges that the individual defendant Dr. Rivkin, a

---

care service plan or managed care entity, as described in subdivision (f) of section 1345 of the Health and Safety Code, "a duty of ordinary care to arrange for the provision of medically necessary health care service to its subscribers and enrollees, where the health care service is a benefit provided under the plan, and [it] shall be liable for any and all harm legally caused by its failure to exercise that ordinary care when both of the following apply: [¶] (1) The failure to exercise ordinary care resulted in the denial, delay, or modification of the health care service recommended for, or furnished to, a subscriber or enrollee. (2) The subscriber or enrollee suffered substantial harm. [¶] . . . [¶] (c) Health care service plans and managed care entities are not health care providers under any provision of law, including, but not limited to, Section 6146 of the Business and Professions Code, Sections 3333.1 or 3333.2 of this code, or Sections 340.5, 364, 425.13, 667.7, or 1295 of the Code of Civil Procedure." Although this section does not apply to these facts, since all the operative allegations deal with events occurring in the year 2000, the section indicates that the Legislature seeks to impose new duties on health care service plans with respect to utilization review, but does not intend that health care services plans shall be considered to be health care providers under MICRA.

[10]Amicus curiae for SRS has pointed out a new provision of the Knox-Keene Act which establishes an independent medical review system for grievances concerning a disputed health care service. (Health & Saf. Code, § 1374.30, subds. (b), (d).) This statute clarifies that decisions regarding disputed health care services relate to the practice of medicine and are not coverage decisions. This statute went into effect January 1, 2001, and thus does not apply to the events giving rise to these claims. However, its enactment confirms that overall, the legislative scheme governing utilization review tends to treat those decisions as requiring medical knowledge and clinical judgment.

shareholder of SRS, made personal contacts with him that caused severe emotional distress, in the form of pressure to drop his appeal with Pacifi-Care. We will evaluate these two types of allegations separately.

First, we have no difficulty in concluding that the allegedly injurious utilization review, conducted by the SRS medical director, amounted to a medical clinical judgment such as would arguably arise out of professional negligence. We disagree with Palmer that this was a purely administrative or economic role played by SRS. Rather, the statutes require that utilization review be conducted by medical professionals, and they must carry out these functions by exercising medical judgment and applying clinical standards. (Health & Saf. Code, §§ 1367.01, 1363.5; see *Johnson, supra,* 101 Cal.App.4th at pp. 884-886.) Recall, Palmer's chief complaint is with the substance and conduct of the PacifiCare appeals process, and he is pursuing that claim through his cause of action against PacifiCare for the breach of the implied covenant of good faith and fair dealing in the subscriber agreement. That is the proper forum for those claims. However, to the extent Palmer seeks to plead intentional infliction of emotional distress against SRS for its part in those decisions, he was required to comply with the pleadings procedure of section 425.13, under MICRA standards.

Next, with respect to the allegations about the pressure and warnings that Dr. Rivkin allegedly inflicted upon Palmer, he did so as an SRS shareholder and representative. Dr. Rivkin is no longer a party to this action, since the demurrer rulings dismissed him. As an individual health care provider, he would normally be within the protection of section 425.13. This raises the problem whether the principal, SRS, should be held vicariously liable for conduct of an agent, who could not be found liable for the alleged conduct. ▪ The rule is, "[t]he liability of an innocent, nonparticipating principal under the respondeat superior doctrine is based upon the wrongful conduct of the agent; the principal cannot be liable unless the agent is liable. [Citation.]" (2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 116, p. 111.) Likewise, if there were pleadings restrictions upon the agent Dr. Rivkin concerning a particular request for relief, it would be inconsistent to find no such pleading restrictions applied to his principal, SRS.

Moreover, to the extent Dr. Rivkin allegedly acted against the interests of Palmer, by going outside his normal health care provider role, there is still an underlying assumption that he had loyalty or patient advocacy responsibilities toward Palmer that he was neglecting or misusing, due to his status

as a primary health care provider.[11] Accordingly, these intentional infliction of emotional distress allegations against SRS, dealing with pressure and warnings, still fall within the context of professional medical negligence and they therefore qualify as allegations that trigger the procedural protections of section 425.13.

For all of these reasons, we conclude Palmer's allegations against SRS fall within the scope of the protections afforded by MICRA policies and the related punitive damages pleadings restrictions of section 425.13.

DISPOSITION

The petition is denied. The parties shall bear their own costs on appeal.

Benke, Acting P. J., and O'Rourke, J., concurred.

---

[11]See Business and Professions Code section 2056.1, which restricts any contractual provisions between physicians and health care service plans that would interfere with the ethical responsibilities or rights of health care providers to discuss with their patients any information relative to the patient's health care, pursuant to the stated legislative intent that a health care provider must be able to communicate freely with and act as an advocate for the patient.