Filed 1/5/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KIRK KING et al., | |
| Plaintiffs and Appellants, | E063527 |
| v. | (Super.Ct.No. RIC1409797) |
| COMPPARTNERS, INC. et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County. Sharon J. Waters, Judge. Affirmed in part; reversed in part.

Law Offices of Patricia A. Law, Patricia A. Law and Jonathan A. Falcioni for Plaintiffs and Appellants.

Murchison & Cumming, William D. Naeve, Ellen M. Tipping and Terry L. Kesinger for Defendants and Respondent.

1

Kirk King (Kirk)[1] sued CompPartners, Inc. (CompPartners) and Naresh Sharma, M.D. (Sharma), for (1) professional negligence; (2) negligence; (3) intentional infliction of emotional distress; and (4) negligent infliction of emotional distress. Kirk's wife, Sara King (Sara), sued CompPartners and Sharma (collectively, "defendants") for loss of consortium. Kirk and Sara (collectively, "the Kings") sought general, special, exemplary, and punitive damages.[2] The trial court sustained defendants' demurrer without leave to amend.

The Kings raise three issues on appeal. First, the Kings contend their claims are not preempted by the Workers' Compensation Act (WCA). Second, the Kings assert defendants owed them a duty of care. Third, the Kings contend the trial court erred by denying them leave to amend. We affirm the sustaining of the demurrer but reverse the denial of leave to amend.

## FACTUAL AND PROCEDURAL HISTORY

### A.    COMPLAINT

The facts in this section are taken from the allegations in the Kings' complaint. On February 15, 2008, Kirk sustained a back injury while at work. In July 2011, Kirk suffered anxiety and depression due to chronic back pain resulting from the back injury. In 2011, Kirk was prescribed a psychotropic medication known as Klonopin.

_____

[1] We use first names for the sake of clarity. No disrespect is intended.

[2] The Kings also sued Mohammed Ashraf Ali, M.D. (Ali); Whittier Drugs; and Does 1 through 100. The forgoing three defendants are not respondents in this appeal. At the time of the hearing on the demurrer, Ali had not been served with the complaint.

The Klonopin was provided to Kirk through Workers' Compensation. In July 2013, a Workers' Compensation utilization review was conducted to determine if the Klonopin was medically necessary.[3] (Labor Code, § 4610, subd. (a).)[4] Sharma, an anesthesiologist, conducted the utilization review. Sharma determined the drug was unnecessary and decertified it. As a result, Kirk was required to immediately cease taking the Klonopin. Typically, a person withdraws from Klonopin gradually by slowly reducing the dosage. Due to the sudden cessation of Klonopin, Kirk suffered four seizures, resulting in additional physical injuries.

In September 2013, someone requested Kirk again be permitted to take Klonopin. In October 2013, Ali, a psychiatrist, conducted a second utilization review. Ali also determined Klonopin was medically unnecessary. Neither Sharma nor Ali examined Kirk in-person, and neither warned Kirk of the dangers of an abrupt withdrawal from Klonopin. Sharma and Ali were employees of CompPartners. CompPartners was a Workers' Compensation utilization review company.

B.    DEMURRER

Defendants demurred to the complaint. Defendants asserted the Kings' claims were preempted by the WCA because they arose out of a utilization review. Defendants interpreted the complaint as objecting to the decision to decertify Klonopin. Defendants

_____

[3] "Utilization review" is the process by which employers "review and approve, modify, delay, or deny" employees' medical treatment requests within the Workers' Compensation system. (Labor Code, § 4610, subd. (a); *State Compensation Ins. Fund v. Workers' Comp Appeals Bd.* (2008) 44 Cal.4th 230, 234, fn. 3 (*State Fund*).)

[4] All subsequent statutory references will be to the Labor Code unless indicated.

3

asserted the utilization review was performed at the behest of Kirk's employer and was conducted in connection with the payment of benefits for Kirk's workplace back injury. Defendants contended the Labor Code set forth a procedure for objecting to a utilization review decision, and that procedure preempted the Kings' complaint.

Alternatively, defendants asserted they did not owe Kirk a duty of care. Defendants argued there was no doctor-patient relationship because they never personally examined Kirk and did not treat him. Defendants reasoned that because there was no relationship, there was no duty of care.

Defendants further asserted the Kings had improperly split a medical malpractice cause of action into two negligence causes of action. Defendants contended the emotional distress causes of action were subsumed by what should have been a single medical malpractice claim, and that Sara's loss of consortium claim failed because there was no underlying tort cause of action to support it.

C.    OPPOSITION

The Kings opposed the demurrer. First, the Kings asserted their claims were not preempted by the WCA. The Kings asserted their claims concerned the failure to provide Kirk with a Klonopin-weaning regimen; they were not disputing the decision to decertify the Klonopin. The Kings contended this claim fell within the ambit of a negligence cause of action—it did not fall within the procedures set forth in the Labor Code/WCA for disputing a utilization review decision.

Second, the Kings asserted defendants owed Kirk a duty of care because Kirk's medical treatment was effectively being determined by defendants' decisions at the

4

utilization reviews.  Third, the Kings asserted they did not improperly split a medical malpractice cause of action because their cause of action for general negligence was brought in the alternative, in case the court determined the defendants were not healthcare providers for purposes of the professional negligence cause of action. Fourth, the Kings asserted Kirk's cause of action for intentional infliction of emotional distress set forth sufficient facts to support an independent cause of action; however, the Kings also referenced a proposed First Amended Complaint filed concurrently with the opposition that alleged additional facts to support the cause of action for intentional infliction of emotional distress.[5]  Fifth, the Kings asserted there were sufficient facts alleged to support the loss of consortium cause of action.

D.    HEARING

The trial court issued a tentative opinion sustaining the demurrer due to the lawsuit being preempted by the WCA.  At the hearing on the demurrer, the Kings explained they were not disputing the decision to decertify Klonopin; rather, they were focused on the manner in which the decision was carried out—the decision to abruptly halt the medication rather than gradually reduce the dosage.  The Kings asserted there were two requirements that triggered Workers' Compensation—(1) the employee was working at the time of the injury, and (2) the injury was proximately caused by the employee's job.  The Kings asserted Kirk's seizures did not meet these two

---

[5]  The Kings did not file the Proposed First Amended Complaint.  The proposed First Amended Complaint is not included with the Opposition in the Appellant's Appendix.

5

requirements and, thus, fell outside the ambit of the WCA. Further, to the extent the WCA encompasses derivative or collateral claims, the seizures were "a wholly separate injury."

The trial court said, "So if I'm wrong on the exclusivity, you trip over another issue which is duty." The Kings explained that a doctor-patient relationship was not needed for a duty to be created. Rather, a duty is owed when a doctor's decision affects the patient's treatment. The Kings asserted Sharma's decision affected Kirk's treatment by effectively dictating the treatment. No other doctor was involved in the decision to terminate the Klonopin; the insurance company asked Sharma if the Klonopin was medically necessary, and based upon Sharma's answer, the Klonopin was discontinued. The Kings asserted Sharma's decision was negligent because no weaning schedule or warnings about seizures were given.

Defendants asserted the Kings were "obviously" contesting the utilization review decision, and a challenge to the utilization review falls within the ambit of the WCA. Next, defendants asserted they owed no duty to Kirk because Kirk did not hire defendants and defendants did not meet Kirk when performing the utilization review.

The Kings again explained that they were not contesting the utilization review decision. The Kings said they did not want Klonopin to be prescribed again; rather, they were complaining about Sharma's decision to abruptly stop the Klonopin rather than gradually stop the Klonopin.

The trial court said, "You may have convinced me that, you know, maybe Worker's Comp exclusivity may or may not apply; because you are correct, he's not

6

actually trying to challenge the decision directly." However, the trial court also said, "I don't think there is a duty." The trial court explained Sharma did not prescribe the Klonopin; rather, "[h]e made a recommendation under the utilization review that it be withdrawn." The court said, "Somebody else prescribed this medication. Somebody else took it off—took him off it immediately without any slow withdrawal. That's the person who made the medical decision for your client, not the doctor who was simply reviewing the procedure."

The Kings asserted "it wasn't anybody else's decision other than Dr. Sharma's to discontinue [the Klonopin]. [¶] It wasn't merely a recommendation. It was Dr. Sharma—is this patient—essentially, the question was: Is this patient going to continue receiving this medication or not, put your stamp on it. He says, No. It ceases." The trial court asked the Kings what facts they could add if they were granted leave to amend their complaint. The Kings said they would add facts about "the patient-client relationship, that CompPartners hired this doctor to make treatment decisions. Based off of a review of the patient's chart, the doctor made treatment decisions."

CompPartners responded with two points. First, CompPartners said that if the Kings were suing due to a discreet injury then Kirk could "directly amend his application for adjudication of claim in the Workers' Compensation Appeals Board and seek retribution or damages for whatever treatment decisions were made during the process." Second, CompPartners argued, "Just think about the duty implications if this Court ruled that someone who reviewed medical records and made a recommendation could be held liable for whatever ultimate decision. Because it's not his decision to

7

make. He's making a review and making a recommendation. They don't have to agree with [the] utilization review. The statute doesn't require it. It just says they will review it and make recommendations, and then it's out of his hands." The Kings again explained that their claim involved a third party physician—not Kirk's employer—and therefore, the claim did not come within the WCA.

The trial court said, "My ruling stands. I'm sustaining the demurrer without leave to amend." The trial court added, "[T]his needs to go up to the Court of Appeals. There is really no good law, any much law under the utilization." The trial court explained that it sustained the demurrer due to both the exclusivity and duty issues.

## DISCUSSION

### A. OVERVIEW OF THE WORKERS' COMPENSATION UTILIZATION REVIEW PROCESS

"The workers' compensation scheme makes the employer of an injured worker responsible for all medical treatment reasonably necessary to cure or relieve the worker from the effects of the injury. [Citation.] When a worker suffers an industrial injury, the worker reports the injury to his or her employer and then seeks medical care from his or her treating physician. After examining the worker, the treating physician recommends any medical treatment he or she believes is necessary and the employer is given a treatment request to approve or deny." (*State Fund*, *supra*, 44 Cal.4th at pp. 237-238.)

Disputes about treatment requests are resolved via the utilization review process, in which "employers can have their utilization review doctors review treatment

8

requests." (*State Fund*, *supra*, 44 Cal.4th at pp. 243-244.) After a utilization review is conducted, a treatment request may be approved, modified, delayed or denied. (§ 4610, subd. (a).) "[U]nder the statutory scheme, only an employer's utilization review physician applying approved criteria can modify, delay, or deny treatment requests—an employer may not, on its own, object to a treatment request. (§ 4610, subds. (e) & (f).)" (*Smith v. Workers' Comp Appeals Bd.* (2009) 46 Cal.4th 272, 279 (*Smith*).)

"Further, the utilization review scheme contains a procedure for resolving disputes over treatment requests that uses doctors, rather than judges, as the adjudicators. [Citations.] If an employee disagrees with the utilization review physician's decision to modify, delay, or deny treatment, the employee can request review by an independent medical evaluator who, after evaluating the evidence, decides whether the sought treatment is necessary." (*Smith*, *supra*, 46 Cal.4th at pp. 279-280; see also § 4610.6.)

### B.    PREEMPTION

#### 1.    *CONTENTION*

The Kings contend the trial court erred in sustaining the demurrer because their causes of action are not preempted by the WCA.

#### 2.    *STANDARD OF REVIEW*

"We independently review the construction of workers' compensation statutes." (*Smith*, *supra*, 46 Cal.4th at p. 277.) We also apply the independent standard of review to rulings on demurrers (*McCall v. PacifiCare of California, Inc.* (2001) 25 Cal.4th 412,

9

415) and rulings on issues of preemption (*Cellphone Termination Fee Cases* (2011) 193 Cal.App.4th 298, 311).  Thus, we apply the independent standard of review.

### 3.    *PREEMPTION*

The Workers' Compensation exclusivity provision provides, in relevant part: "Liability for the compensation provided by this division, in lieu of any other liability whatsoever to any person . . . shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment . . . in those cases where the following conditions of compensation concur:  . . .  [¶] . . . [¶] (2)  Where, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment.  [¶] (3) Where the injury is proximately caused by the employment, either with or without negligence."  (Former § 3600, subd. (a) [eff. Jan. 2010].)  In some portions of the Labor Code, the term "employer" includes a utilization review organization.  (§ 4610.5, subd. (c)(4).)

"Based on the [foregoing] statutory language, California courts have held workers' compensation proceedings to be the exclusive remedy for certain . . . claims deemed collateral to or derivative of the employee's injury."  (*Snyder v. Michael's Stores, Inc.* (1997) 16 Cal.4th 991, 997.)  Derivative or collateral claims must still meet the conditions of compensation set forth *ante*:  (1) that the injury occur within the course of the employee's job; and (2) the injury is proximately caused by the employee's job.  (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal. 4th 800 813-814 (*Vacanti*).)  If the collateral or derivative claim does not meet the

10

conditions of compensation, then it is not subject to exclusivity. In other words, "a cause of action predicated on an injury where 'the basic conditions of compensation' are absent is not preempted. [Citation.] For example, courts have allowed tort claims in cases where the alleged injury—the aggravation of an existing workplace injury—did not occur in the course of an employment relationship." (*Ibid.*)

In the Kings' complaint, they allege Kirk suffered a back injury at work in 2008. Then, in 2013, "Sharma failed to provide any warnings concerning a gradual reduction of the dosage or continue Mr. King on the Klonopin until the step-down process of such medication was completed." This failure on Sharma's part caused Kirk to suffer seizures. The seizure injury did not occur in the course of Kirk's job because there are no allegations Kirk was working at the time of the seizures. The seizure injury was not proximately caused by Kirk's job because the cause of the seizures is alleged to be Sharma's failure to provide appropriate information or a weaning regime—nothing about Kirk's job is alleged to be the cause of the seizures. As a result, based upon the Kings' complaint, the conditions of compensation have not been met.

We note, however, the *Vacanti* opinion further provides, "Courts have also consistently held that injuries arising out of and in the course of the workers' compensation claims process fall within the scope of the exclusive remedy provisions because this process is tethered to a compensable injury." (*Vacanti*, *supra*, 24 Cal.4th at p. 815.) For example, where a person's business is damaged due to "the failure to receive full and timely payment on their lien claims before the [Workers' Compensation Appeals Board]," those "causes of action [are] collateral to or derivative of a

11

compensable workplace injury and fall[] within the scope of the exclusivity provisions." (*Ibid.*)

When this portion of the *Vacanti* opinion is read in context with the portion discussed *ante*, which requires the conditions of compensation to be met, we interpret *Vacanti* to mean that if something goes wrong in the claims process for the work place injury, such as collecting the money for the workplace injury, then that collateral claim must stay within the exclusive province of workers' compensation. However, if a new injury arises or the prior workplace injury is aggravated, then the exclusivity provisions do not necessarily apply. (*Vacanti*, *supra*, 24 Cal.4th at pp. 813-814.)

The Kings' complaint presents an interesting issue on this point. The Kings complaint reads, "Dr. Sharma failed to provide any warnings concerning a gradual reduction of the dosage *or* continue Mr. King on the Klonopin until the step-down process of such medication was completed. Due to the improper withdrawal of the medication, Mr. King sustained a series of four seizures resulting in additional physical injury. In September of 2013, there was a request to return Mr. King to the Klonopin due to the continuation of seizures. In October of 2013, another utilization review was performed by Mohammed Ashraf Ali, M.D., a Psychiatrist. Once again, Mr. King was denied the use of the Klonopin. Dr. Ali failed to authorize the use of the Klonopin until a gradual reduction in dosage was achieved or warn of the abrupt withdrawal of the medication." (Italics added.)

The Kings have alleged two options for how Sharma allegedly harmed Kirk. The first option is that Sharma harmed Kirk by not informing Kirk of the possible

12

consequences of abruptly ceasing Klonopin. This option involves a second step in the utilization review process: Sharma determines the drug is medically unnecessary and then must warn Kirk of the possible consequences of that decision. The second option is that Sharma harmed Kirk by incorrectly determining Klonopin was medically unnecessary, because the drug was medically necessary until Kirk was properly weaned from it. In this second option, the "medically necessary" decision was alleged to have been incorrectly determined, and thus, part of the claims process is alleged to have gone wrong. The "medically necessary" question is directly part of the claims process. (§ 4610, subd. (c).)

To the extent the Kings are faulting Sharma for not communicating a warning to Kirk, their claims are not preempted by the WCA because that warning would be beyond the "medical necessity" determination made by Sharma. To the extent the Kings are faulting Sharma for incorrectly deciding the medical necessity decision because Klonopin was medically necessary until Kirk was weaned, and thus a particular number of pills, e.g., 10, 20, should have been authorized for weaning, the Kings' claims are preempted by the WCA because the Kings are directly challenging Sharma's medical necessity determination.

Due to the uncertainty of the allegations in the complaint, the trial court properly sustained the demurrer. (Code, Civ. Proc., § 430.10, subd. (f) [pleading is uncertain].) However, because there is a possibility the causes of action are not preempted, the trial court erred by denying the Kings leave to amend. (See *Nolte v. Cedars Sinai Medical Center* (2015) 236 Cal.App.4th 1401, 1406 ["'If it is reasonably possible the pleading

13

can be cured by amendment, the trial court abuses its discretion by not granting leave to amend'"].)

C.    *DUTY*

The Kings contend the trial court erred by concluding defendants did not owe Kirk a duty of care.

"It long has been held that an essential element of a cause of action for medical malpractice is a physician-patient relationship giving rise to a duty of care." (*Mero v. Sadoff* (1995) 31 Cal.App.4th 1466, 1471.) "When the physician-patient relationship exists, either expressed or implied, the patient has a right to expect the physician will care for and treat him with proper professional skills and will exercise reasonable and ordinary care and diligence toward the patient." (*Keene v. Wiggins* (1977) 69 Cal.App.3d 308, 313 (*Keene*).)

Case law provides a utilization review doctor has a doctor-patient relationship with the person whose medical records are being reviewed. In *Palmer v. Superior Court* (2002) 103 Cal.App.4th 953 (*Palmer*), the plaintiff sued his insurance carrier (the HMO) and his primary healthcare provider (the hospital). The trial court struck the plaintiff's allegations claiming entitlement to punitive damages against the hospital under Civil Code of Procedure section 425.13, which reflects punitive damages cannot be included in a complaint for damages arising out of the professional negligence of a healthcare provider. The plaintiff sought a writ of mandate setting aside that order. (*Palmer*, at p. 957.)

14

The plaintiff had lost both legs below his knees due to a bacterial infection, and needed leg prostheses to walk. (*Palmer*, *supra*, 103 Cal.App.4th at p. 958.) In 2000, the plaintiff's prosthetist (Norton) concluded the plaintiff's prostheses needed to be replaced. Norton sent a letter to the plaintiff's primary care physician (Rivkin), a doctor at the hospital, recommending the use of ultra light prostheses. At Rivkin's request, Norton prepared a cost estimate for the prostheses. A hospital employee from Rivkin's office called Norton to inform him the prostheses request had been approved as medically necessary, and the request was being forwarded to the hospital's utilization review department. The plaintiff received a letter from the hospital reflecting the request had been denied because the hospital's medical director determined the prostheses were not medically necessary. (*Id.* at pp. 958-959.)

Rivkin informed the plaintiff that he was being pressured by the HMO to deny the new prostheses. However, Rivkin drafted a letter asserting the prostheses were medically necessary. The HMO sent the plaintiff a letter reflecting it upheld the denial of the prostheses, and the plaintiff had the right to have the decision reviewed by the HMO's appeals and grievance review committee. The plaintiff initiated the review process, but a prompt decision was not issued. (*Palmer*, *supra*, 103 Cal.App.4th at pp. 959-960.)

The plaintiff filed a lawsuit against the HMO, the hospital and Rivkin, which included causes of action for intentional and negligent infliction of emotional distress. (*Palmer*, *supra*, 103 Cal.App.4th at p. 960.) The plaintiff alleged the hospital provided a utilization review to the HMO, which determined whether requested medical services

15

were medically necessary. (*Id.* at p. 958.) The hospital sought to strike the punitive damages allegations because the cause of action arose out of the professional negligence of a healthcare provider. (Code Civ. Proc., § 425.13.) The trial court found the plaintiff's claims were "directly related to the manner in which [the hospital] provided professional health care services, whether through Dr. Rivkin or [the hospital's] utilization review." (*Palmer*, at p. 961.)

The appellate court explained, "'The test of whether a health care provider's negligence constitutes professional negligence is whether the negligence occurred in rendering services for which the health care provider is licensed.'" (*Palmer*, *supra*, 103 Cal.App.4th at p. 962.) The appellate court examined whether the unfavorable utilization review services conducted by the hospital amounted to allegations of medical negligence. (*Ibid.*) The plaintiff argued the utilization review did not amount to healthcare services, and thus, he could sue for punitive damages. The plaintiff asserted the utilization review was purely administrative. (*Id.* at p. 968.) The appellate court concluded that the hospital's medical director, who concluded the prostheses were not medically necessary, "was acting as a health care provider as to the medical aspects of that decision." (*Id.* at p. 969.) The appellate court explained that the medical director's utilization review decision amounted to medical care, and was not purely administrative, because the utilization review had to "be conducted by medical professionals, and they must carry out these functions by exercising medical judgment and applying clinical standards." (*Id.* at p. 972.) The appellate court concluded the trial court properly struck the punitive damages allegations because the damages arose out of

16

the professional negligence of a health care provider (Code Civ. Proc., § 425.13, subd. (a)). (*Palmer*, at p. 973.)

Thus, under *Palmer*, there is a doctor-patient relationship between Kirk and Sharma. Because there is a doctor-patient relationship, Sharma owed Kirk a duty of care. As quoted *ante*, "When the physician-patient relationship exists, either expressed or implied, the patient has a right to expect the physician will care for and treat him with proper professional skills and will exercise reasonable and ordinary care and diligence toward the patient." (*Keene*, *supra*, 69 Cal.App.3d at p. 313.)

However, the existence of a duty does not mean "a doctor is required to exercise the same degree of skill toward every person he sees. The duty he owes to each varies with the relationship of the parties, the foreseeability of injury or harm that may be expected to flow from his conduct and the reliance which the person may reasonably be expected to place on the opinion received. A case-by-case approach is required." (*Keene*, *supra*, 69 Cal.App.3d at p. 313.) In other words, determining the scope of the duty owed depends upon the facts of the case.

In *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, our Supreme Court examined whether a murderer's therapist had a duty to warn the victim of the murderer's intention to kill the victim, even though the victim was not the therapist's patient. (*Id.* at pp. 430-431.) Our Supreme Court concluded, "[O]nce a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger.

17

While the discharge of this duty of due care will necessarily vary with the facts of each case, in each instance the adequacy of the therapist's conduct must be measured against the traditional negligence standard of the rendition of reasonable care under the circumstances." (*Id.* at p. 439, fn. omitted.)

Thus, while there is a duty owed by Sharma to Kirk, the scope or discharge of that duty will depend upon the facts/circumstances of this particular case. The Kings' complaint includes few factual details. For example, it is unclear how Kirk came to learn that the Klonopin had been decertified—did he receive a letter, a phone call, a denial at the pharmacy widow? The complaint reflects Sharma was the only doctor involved in the decision to decertify the Klonopin, until Ali reviewed that decision and affirmed it, but it is unclear what input, if any, the prescribing doctor may have had following Sharma's decision. Given the lack of factual allegations related to duty, the scope of the duty owed cannot be determined from the complaint. Accordingly, we conclude the trial court properly sustained the demurrer. (Code Civ. Proc., § 430.10, subd. (e) [failure to plead sufficient facts].)

Nevertheless, the trial court should have granted the Kings leave to amend because it is possible, given the allegation that Sharma was the only doctor involved in the decision, that, when more details are provided they could support a conclusion that, under the circumstances, the scope of Sharma's duty included some form of warning Kirk of or protecting Kirk from the risk of seizures. The Kings have explained they do have further facts to add to a potential First Amended Complaint. For example, they could offer an additional fact such as seizures being a known consequence of abruptly

ceasing Klonopin, and Sharma knowing that his decision to decertify the Klonopin would lead to the immediate denial of more Klonopin without any review by Kirk's prescribing doctor. (See *Nolte v. Cedars Sinai Medical Center*, *supra*, 236 Cal.App.4th 1401, 1406 ["'If it is reasonably possible the pleading can be cured by amendment, the trial court abuses its discretion by not granting leave to amend'"].) In sum, additional facts could cure the problems presented by the complaint and the Kings have additional facts to plead; therefore, the trial court erred by denying the Kings leave to amend.

## DISPOSITION

The order sustaining the demurrer is affirmed. The denial of leave to amend is reversed, and the case remanded for the Kings to file an amended complaint. The parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION

MILLER                                    
                                                    J.

We concur:

McKINSTER                       
              Acting P. J.

KING                                    
                                    J.

19